Willey v. Kirkpatrick

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Argued: April 1, 2015      Decided: August 28, 2015)

Docket No. 13-699

_____

AARON WILLEY,

*Plaintiff-Appellant*,

—v.—

ROBERT A. KIRKPATRICK, M. MONAHAN, MARTAIN KERNEY, SCOTT LAMBERT,
TAYLOR ROBERTS, M. SZTUK, A. ALLESSANDRO, M. OVERHUFF, TOM SCHOELLKOPFL,
JEFF JESZORSKI,

*Defendants-Appellees.*

_____

B e f o r e:    KATZMANN, *Chief Judge*, POOLER and CARNEY, *Circuit Judges*.

_____

Appeal from a judgment of the United States District Court for the Western
District of New York (Telesca, *J.*), which granted summary judgment to the
defendants and dismissed all of the plaintiff's claims brought under 42 U.S.C.
§ 1983. We conclude that the grant of summary judgment conflicts with Rule 56(f)
of the Federal Rules of Civil Procedure because it reached, sua sponte and

without notice, claims not briefed in the defendants' motion. We also vacate the district court's conclusion that the plaintiff failed to state claims for unsanitary conditions and retaliation, and we write to clarify the legal standard for such claims. Finally, we revive Willey's claims for inadequate nutrition, theft of legal documents, harassment, malicious prosecution, and false imprisonment as sufficiently alleged, and provide guidance for the district court on remand. Accordingly, we **VACATE** the judgment and **REMAND** for further proceedings consistent with this opinion.

—————————

RYAN A. LEMA (Timothy W. Hoover and Michael S. Silverstein, *on the brief*), Phillips Lytle LLP, Buffalo, New York, *for Plaintiff-Appellant*.

ROBERT M. GOLDFARB, Assistant Solicitor General, *for* Andrea Oser, Deputy Solicitor General, Barbara D. Underwood, Solicitor General, and Eric T. Schneiderman, Attorney General of the State of New York, Albany, New York, *for Defendants-Appellees*.

—————————

KATZMANN, *Chief Judge*:

Plaintiff-Appellant Aaron Willey alleges that, while incarcerated in New York, he endured a cruel campaign of harassment at the hands of corrections officers in retaliation for his refusal to provide false information against another inmate. The course of retaliatory conduct he alleges included smaller indignities like frequent harassment and a week's worth of meals that were nutritionally inadequate. But Willey also alleges that he was on three occasions exposed to

unsanitary conditions of confinement in violation of the Eighth Amendment. The most grotesque exposure Willey alleges is that officers placed him in solitary confinement with a Plexiglas shield restricting the airflow to his small cell and then incapacitated his toilet, so that he was reduced to breathing a miasma of his own accumulating waste. The two other alleged exposures to unsanitary conditions involved Willey's detention in an observation cell whose walls and mattress were smeared with feces and stained with urine. Willey alleges further retaliatory conduct including theft of his legal documents, malicious prosecution, and false imprisonment.

Willey proceeded pro se below, naming as defendants several corrections officers and their supervisors at the Wende Correctional Facility, in Alden, New York, where Willey was incarcerated during the events alleged in his complaint. When these defendants moved to dismiss the complaint for failure to state a claim, the district court (Siragusa, *J.*) denied the motion in its entirety. Several years later, the district court (Telesca, *J.*) granted the defendants' motion for summary judgment, deciding in sum and substance that Willey's amended complaint failed to state a claim. The district court's grant of summary judgment

3

in part on grounds not raised by the movants, without notice to Willey or an opportunity for him to respond, conflicts with Rule 56(f) of the Federal Rules of Civil Procedure. As to those grounds that were raised by the defendants, the district court's conclusion that Willey's complaint failed to state a claim rested on an erroneous legal foundation.

In this opinion, we first reiterate the proper standard for granting summary judgment on grounds not raised by the movant, which was not met here. Second, we clarify the standard for a claim for unconstitutional retaliation. Third, we disagree with the district court's analysis of Willey's claim for unsanitary conditions. Fourth, we revive Willey's claims for nutritionally inadequate meals, theft of legal documents, harassment, malicious prosecution, and false imprisonment. Finally, we suggest to the district court that on remand Willey receive appointed counsel, an opportunity to take further discovery, and leave to file a second amended complaint.

**BACKGROUND**

**I. Willey's Complaint**

This summary of the relevant factual background we draw principally from the allegations in Willey's complaint, because, as we will explore further, the defendants' motion for summary judgment rested entirely on the legal sufficiency of the allegations of the complaint and not on any evidence. Willey, pro se, filed his original typewritten complaint on August 31, 2007, and filed his handwritten amended complaint on April 7, 2010. Because they are substantively identical, with one exception discussed below, this recitation cites to allegations in the original complaint, all of which appear also in the amended complaint. *Compare* Compl., J.A. 17–36, *with* Am. Compl., J.A. 158–172.

Beginning at age 18, Willey was incarcerated at the Wende Correctional Facility in Alden, New York, from April 2004 until October 2006, although during this period he was housed for five months at the Central New York Psychiatric Facility. The events giving rise to this suit all occurred at Wende, and the defendants are Wende corrections officers, hearing officers, and their supervisors who were employed there during Willey's incarceration. Willey alleges that, on

5

October 15, 2005, he was approached on his way to evening recreation by Sergeant Scott Lambert, who stopped Willey and requested identification. Corrections officer Taylor Roberts then performed a pat frisk of Willey, which uncovered nothing unusual. Nevertheless, Roberts handcuffed Willey and escorted him "into a room with no cameras or witnesses present." J.A. 20. In this room, Willey alleges, the following took place:

> I was questioned by defendant LAMBERT about another prisoner who was supposedly smuggling drugs into the prison. I explained that I had no knowledge or recollection of involvement with this person, nor did I even know who this person was. Defendant LAMBERT then opened a desk drawer and pulled out what appeared to be a weapon or piece of metal. Defendant LAMBERT placed this piece of metal on the desk between us, and threatened me by stating, "Either you work with us as an informant or you are going to be charged with a weapon." At this time I stopped talking completely, to which defendant LAMBERT responded, "Have it your way." Corrections officers then took me to the WCF special housing unit (solitary confinement) where I was in fact falsely imprisoned.

*Id.*[1]

---

[1] In this and subsequent quotations from Willey's complaint, the defendants' motion for summary judgment, and the district court decision, we have taken the liberty of correcting typographical errors for clarity's sake.

Two days later, on October 17, Willey "was issued a false misbehavior report alleging false charges that [he] was in possession of a weapon/contraband." *Id.* At a hearing held on October 19, Willey was adjudged guilty of the shank-possession charge, but he alleges that he was never told that the hearing was to occur nor provided with the opportunity to attend or to present witnesses or evidence. Willey appealed internally to the statewide Special Housing Unit director in Albany, Donald Selsky, who reversed the finding of guilt and ordered a new hearing. At the new hearing, Willey was allowed to appear, but the hearing officer Martain Kerney allegedly threatened to beat Willey and called him a "young punk." *Id.* at 22. Kerney eventually ejected Willey and found him guilty in absentia, sentencing him on December 28, 2005, principally to 180 days of solitary confinement (also known as Special Housing Unit or the "S.H.U."). Willey filed another appeal with Selsky.

With his appeal pending, Willey remained in solitary confinement. Willey alleges that he was "continuously harassed psychologically, emotionally, verbally, and sexually by corrections officers but particularly by defendant A. ALLESSANDRO." *Id.* at 28. This conduct included, while watching Willey

shower, Sergeant Allessandro "licking his lips and blowing kisses toward [Willey]." *Id.* Just over a month into his time in solitary confinement, on November 26, 2005, Willey alleges that he was escorted by Allessandro and corrections officer M. Sztuk to the shower, and upon Willey's return found his cell "trashed, i.e., toilet flooded, water all over; legal paperwork, books, personal letters scattered all over and out of their original places." *Id.* at 23. That evening, Willey asked Sztuk for a search contraband slip to document what happened, to which Sztuk responded by threatening Willey with worse punishments if he persisted.

Willey also allegedly learned from other inmates confined near his cell that they had seen Sztuk removing Willey's "rolled up legal paperwork." *Id.* at 24. Willey then shouted that he wanted to speak to a supervisor, to which Allessandro replied that Willey should give it a rest or he would soon be moved to the restricted side of solitary. "I'm not giving it a rest—you people stole my legal paperwork," answered Willey. *Id.* Sztuk then responded, "What's that Willey, you said you are going to 'shit us down'?," prison argot for throwing feces or urine at a corrections officer. *Id.* Willey denied having made the threat.

8

Because Allessandro and Sztuk said that Willey made this threat against them, he was moved to the restricted side of solitary, and a Plexiglas cell shield was placed over the bars, preventing air circulation. In Willey's complaint, he alleges:

> For the entire duration of time I was behind the cell shields, defendant A. ALLESSANDRO subjected me to various forms of harassment including turning off my toilet water pressure, so that I couldn't flush my toilet, thereby forcing me to stay in a cell with restricted air circulation and breathe in urine/feces odors. At all times mentioned defendant JEFF JESZORSKI was the acting sergeant supervising defendants A. ALLESSANDRO, M. SZTUK, and M. OVERHUFF, and allowed them to harass plaintiff, and abdicated his legal duty to stop and prevent above-listed defendants from harassing plaintiff; defendant JEFF JESZORSKI also participated in harassing plaintiff.

*Id.* at 25 (citation omitted).

Sztuk issued Willey an allegedly false misbehavior report, on November 28, 2005, which stated that Sztuk had read Willey's lips and that Willey had mouthed a threat to throw his waste at Sztuk. After a hearing at which Willey testified and cross-examined Sztuk, Willey was found guilty and sentenced principally to 90 days of solitary confinement. Willey once again filed an appeal with Selsky.

On December 18, 2005, corrections officer M. Overhuff approached Willey's cell after dinner. Willey alleges:

> I placed my cups, tray, and utensils on the feed-up port so defendant OVERHUFF could see I was turning everything in (this was my usual practice). However, defendant M. OVERHUFF purposely with intent to harass and annoy plaintiff refused to take my garbage. On December 19, 2005, I was issued a false misbehavior report written by defendant M. OVERHUFF alleging I refused to turn in my garbage on December 18, 2005.

*Id.* at 26–27. For the week before the hearing on this misbehavior report, Deputy Superintendent of Security M. Monahan placed Willey on a pre-hearing restricted diet that, Willey alleges, was "most definitely cruel and unusual punishment as per it consists of nothing more than a loaf of bread (usually stale) and dried-up cabbage." *Id.* at 27.

At the hearing for this misbehavior report on January 3, 2006, hearing officer Tom Schoellkopfl allegedly refused to permit Willey to question a witness and then removed Willey from the hearing. Schoellkopfl then allegedly told Willey, "You are going to die in the S.H.U.—you young punk." *Id.* at 28. Schoellkopfl found Willey guilty and sentenced him on January 10, 2006,

10

principally to 30 days of solitary confinement. As he had with each previous finding of guilt, Willey filed an administrative appeal with Selsky.

Willey left solitary confinement on February 9, 2006:

> All of the above-noted harassments that I was being subjected to resulted in my becoming severely depressed and attempting suicide by swallowing numerous ibuprofen pills. . . . I was taken via ambulance to Erie County Medical Center. While inside the ambulance, I was strapped down to a gurney, handcuffed, and shackled. Someone inserted a needle into my arm and someone placed a gas mask over my face. From this point forward I don't remember anything until I woke up strapped to a bed in ECMC.

*Id.* at 29. Willey alleges that, before suffering the cruelty of Wende's officers, he "had no significant mental-health issues and was not taking any mental-health medication." *Id.* He attributes to the officers' conduct "a significant amount" of his mental-health problems. *Id.*

When Willey returned from the hospital to Wende, he was placed "into a mental-health observation cell that was extremely filthy and smelled of urine/feces." *Id.* Willey remained "naked in the observation cell for 14 days" before he was transferred to the Central New York State Psychiatric Center for about five months. *Id.* When he returned to Wende, on July 28, 2006, Willey was once again placed "into an extremely dirty observation cell," which "had urine

11

stains on the floor and fecal stains on the walls and mattress. The smell in the cell was extremely bad." *Id.* at 30. Willey remained there until August 24, 2006, when he was sent back to solitary confinement.

The final misbehavior report issued to Willey was served the next day and alleged that he had "kicked a corrections officer while in handcuffs and feet restraints on February 10, 2006," while he was being returned to Wende from the hospital. *Id.* Following a hearing, Schoellkopfl found Willey guilty and sentenced him principally to 180 days of solitary confinement. Willey once again appealed to Selsky.

Willey sent a letter to Wende Superintendent Robert A. Kirkpatrick on September 17, 2006, which related Willey's belief that he had been falsely charged and unfairly sentenced to solitary confinement and also requested his release to the general population within Wende. By letter dated October 4, 2006, Kirkpatrick declined to take action. Willey also filed with the Attorney General of the State of New York a Notice of Intention to File a Claim, *see* N.Y. Ct. Cl. Act § 10, concerning Willey's treatment in custody. Finally, on October 19, 2006, Willey was transferred from Wende to the Attica Correctional Facility.

Many of the administrative appeals that Willey filed with Selsky met with success. In addition to his first appeal, already mentioned, which prevailed on procedural grounds, Willey's appeal from his conviction for possession of the shank was also successful—Selsky reversed that conviction on February 28, 2006. That same day, Selsky also reversed the conviction related to dinner-tray collection. These decisions arrived a few weeks after Willey's attempted suicide. Selsky did affirm, on February 17, 2006, the conviction for Willey's threatening to throw feces or urine at Sztuk. Selsky also affirmed, on December 5, 2006, the conviction for Willey's kicking an officer, although Selsky halved the sentence from six months of punishment to three months. Willey served this sentence at Attica.

Willey learned, on November 28, 2006, after his transfer to Attica, that he had been criminally charged in Alden Town Court for the same alleged conduct—possessing a shank—for which he was originally punished with solitary confinement and on which he prevailed in his first two administrative appeals. The criminal charge was allegedly supported by a deposition from Roberts attesting that Willey had possessed the shank at Wende. Willey again

denied having ever possessed a shank, both in person and in a lengthy letter to the presiding judge, Justice LaDuca, who dismissed the criminal charges on April 3, 2007.

## II. Proceedings Below

All these alleged facts appeared in Willey's complaint, which the defendants moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court (Siragusa, *J.*) denied the motion in its entirety, finding that Willey's allegations stated viable claims and that the defendants were not entitled to qualified immunity. *See* J.A. 119–28, Decision and Order, *Willey v. Kirkpatrick et al.*, No. 07-cv-6484 (W.D.N.Y. Oct. 9, 2009). The district court noted that, although false misbehavior reports generally do not give rise to a claim under 42 U.S.C. § 1983, they do when combined with a deprivation of due process at the resulting hearing or when done in retaliation for the exercise of a constitutional right. The district court observed "that it is unclear whether there is a constitutional right 'not to snitch.' " *Id.* at 125 n.2.

The district court referred the case to a magistrate judge for "non-dispositive pre-trial matters." *Id.* at 128. The defendants answered on October 23,

14

2009, denying all of the complaint's allegations and admitting only that they were employed at Wende in 2005. Willey moved for partial summary judgment on January 11, 2010. This motion was denied sua sponte by the district court without prejudice to its reassertion after discovery concluded. Willey, with leave from the district court, filed his amended complaint on April 7, 2010, and the defendants filed an identical answer on June 14, 2010. The defendants answered interrogatories but were not deposed. The defendants moved for summary judgment on February 21, 2012. Willey opposed that motion and moved for appointment of counsel on March 22, 2012. The district court denied Willey's motion for appointment of counsel on May 2, 2012. With the motion for summary judgment fully briefed, Judge Siragusa ordered the case transferred to Judge Telesca on January 24, 2013. Eleven days later, Judge Telesca granted summary judgment to the defendants in a 26-page decision, the decision from which Willey takes this appeal. *See* J.A. 656–81, Decision and Order, *Willey v. Kirkpatrick et al.*, No. 07-cv-6484 (W.D.N.Y. Feb. 4, 2013).

The defendants' Rule 56 statement in support of their motion for summary judgment was unusual, spanning only ten paragraphs of facts about which, they

contended, "there is no genuine issue to be tried." J.A. 607. The first two paragraphs of the Rule 56 statement recited that Willey was incarcerated at Wende and that the defendants worked there. The next seven paragraphs recounted some of the allegations Willey made in his complaint, and the final paragraph noted that the defendants denied all the claims in their answer. *See id.* at 607–09. The defendants attached as evidence only Willey's Certified Inmate Record. *See id.* at 614–23.

The defendants' brief in support of their motion for summary judgment was similarly unorthodox. In its telling, the defendants:

> move[d] for summary judgment on a variety of grounds: that the plaintiff has nothing more than his own subjective belief that he has been subjected to unlawful harassment stemming from false misbehavior reports, and [that] the alleged incidents do not amount to a legally cognizable claim upon which relief can be granted as a matter of law.

*Id.* at 624–25. In keeping with this framing, the brief argued that various of the claims in Willey's complaint were legally insufficient, *e.g.*, "Claim[s] against defendants Lambert and Roberts fail to state a claim upon which relief can be granted as a matter of law." *Id.* at 626. The defendants' brief characterized the claims in Willey's complaint as seeking redress for (1) being placed in mechanical

16

restraints; (2) being ejected from a hearing; (3) having his cell "trash[ed]" and property stolen; and (4) being confined behind cell shields, being issued false misbehavior reports, and receiving inadequate nutrition. *See id.* at 626–30. The defendants also urged that *respondeat superior* was an insufficient basis on which to sustain a constitutional claim against Superintendent Kirkpatrick. *See id.* at 630.

Willey opposed the motion with an eight-page document that contained both legal arguments and factual averrals. He styled the document as a declaration, writing, "I, Aaron Willey, do hereby declare under penalty of perjury that all of the foregoing information is true to the best of my knowledge and belief." *Id.* at 651. Willey's declaration pointed out that the defendants' brief covered only some of his claims, stating that "there are other events not described by the defendants that constituted violations of the plaintiff's constitutional rights," including malicious prosecution and unsanitary conditions of confinement. *Id.* at 645.

The district court's February 4, 2013 decision and order (Telesca, *J.*), from which this appeal is taken, began with a recitation of facts "drawn from the pleadings and discovery documents on file," and viewed in the light most

17

favorable to Willey. *Id.* at 657. The decision recounted five principal incidents alleged in the complaint: (1) the October 2005 misbehavior report for possessing a weapon and the resulting solitary confinement; (2) the November 2005 misbehavior report for threatening to attack officers with human waste and the resulting cell shields and water shut-off; (3) the December 2005 misbehavior report for refusing to turn in a food tray and the resulting restricted diet; (4) the harassment in solitary confinement and the resulting suicide attempt and confinements in the mental-health observation cells; and (5) the August 2006 misbehavior report for kicking an officer. *See id.* at 658–63.

In its analysis, the district court first noted that "to maintain an actionable claim against correction[s] officers for filing a false misbehavior report, the inmate must be able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right." *Id.* at 666–67. The district court analyzed only the first of these options, stating, "Willey ha[d] not alleged that the misbehavior reports were issued in retaliation for his exercise of a constitutionally protected right." *Id.* at 667. The district court reasoned that although Willey's

18

exclusion from the disciplinary hearing "was violative of Willey's state regulatory rights . . . , his federal constitutional rights were not violated thereby." *Id.* at 669.

Turning to the alleged destruction of Willey's property, including legal documents, the district court stated that "even the intentional destruction of an inmate's property by a prison officer does not violate the Due Process Clause if the state provides that inmate with an adequate post-deprivation remedy." *Id.* Accordingly, Willey's claim that Sztuk and Allessandro "stole legal documents from his cell, and destroyed his personal property" failed to state "an actionable constitutional claim because New York state law provides him with an adequate post-deprivation remedy, i.e., § 9 of the Court of Claims Act." *Id.* at 669–70. Regarding the claim of harassment, the district court reasoned that because Willey did not allege "uninvited physical or sexual contact" by Allessandro, his "annoying conduct and comments, unaccompanied by physical threats or attacks, do not amount to a constitutional violation." *Id.* at 671.

The district court then analyzed Willey's claim for unsanitary conditions of confinement, notwithstanding that the defendants "failed to address [it] in their motion for summary judgment." *Id.* Canvassing our precedents and those of sister

19

circuits, the district court discerned a circuit split "[w]here an inmate's exposure to waste lasts for three or four days." *Id.* at 674 (internal quotation marks omitted). The district court found Willey's allegations insufficient:

> Especially because Willey has adequately pleaded maliciously willful conduct by C.O. Allessandro, rather than mere negligence, the alleged shut-off of the running water to Willey's toilet for several days places this case on the borderline between the levels of discomfort to be expected in prison and unacceptable, inhumane conditions. After reviewing the cases cited above, however, the Court concludes that on the particular facts presented here, Willey's conditions-of-confinement claim cannot withstand summary judgment. First, Willey is vague as to the dates that the alleged shut-off occurred, and has made conflicting allegations about the duration ("extensive lengths of time" versus "seven days" versus the time between December 1, 2005, and January 10, 2006). Second, Willey has not claimed that human waste from his toilet overflowed into his cell. Third, Willey has not claimed that he suffered sickness or other ill effects as a result of the malodorous atmosphere caused by the water shut-off.

*Id.* at 675–76 (citations omitted).

Finally, the district court also found insufficient Willey's claim for inadequate nutrition while placed on a restricted diet for one week by Monahan. "Courts in this Circuit routinely have dismissed claims similar to Willey's, finding that the inmate failed to establish that he experienced a sufficiently serious deprivation for purposes of the Eighth Amendment." *Id.* at 677–78. Accordingly,

20

the district court granted the defendants' motion for summary judgment and dismissed Willey's Amended Complaint in its entirety. This appeal timely followed.

## DISCUSSION

### I. Standard of Review and Summary Judgment

Our standards of review are familiar. We review de novo a dismissal under Rule 12(b)(6) for failure to state a claim, and we must reverse if the complaint contains sufficient factual matter that, accepted as true, states a plausible claim for relief. *See Cruz v. TD Bank, N.A.*, 711 F.3d 261, 267 (2d Cir. 2013). We employ the same standard of review for a judgment on the pleadings under Rule 12(c). *See Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). And we review de novo a grant of summary judgment under Rule 56, construing all evidence in the light most favorable to the non-moving party. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 173 (2d Cir. 2006). We affirm summary judgment only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because Willey was pro se below, we must

21

interpret his papers liberally "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also* Fed. R. Civ. P. 8(e).

The parties disagree about the standard we should use to review the decision below. Willey, who is counseled on appeal, argues that we should review the decision as having been made under Rule 12(b)(6) or Rule 12(c) because it "essentially accepted the facts as alleged in Mr. Willey's complaint, and dismissed each claim for failure to state a claim based on those allegations." Appellant's Br. 19. The defendants, by contrast, urge us to review the decision as a routine grant of summary judgment. "The fact that the district court found that certain of plaintiff's allegations, even with evidentiary support, failed to state viable claims at all does not alter the procedural context of the court's order—a duly interposed motion for summary judgment by defendants . . . ." Appellees' Br. 12.

It is true, as Willey contends, that the district court's decision rested entirely on its view that Willey's complaint failed to state a claim for which relief may be granted. Without engaging in any consideration of facts produced by the limited discovery in this case, the district court nominally granted summary judgment

22

under Rule 56 but was in effect granting judgment as a matter of law on the pleadings under Rule 12(c). *Cf. Johnson v. Pelker*, 891 F.2d 136, 139 n.2 (7th Cir. 1989) ("Without expressly saying so, the district court by granting summary judgment, effectively on the pleadings, treated the motion as one to dismiss under [Rule] 12(b)(6)."). But the distinction is immaterial to our standard of review, which we conduct de novo in either case, and we see no reason why legal issues may not be decided at summary judgment.

But a grant of summary judgment must comport with the Federal Rules of Civil Procedure. Rule 56 does permit a sua sponte grant of summary judgment dismissing a claim—but only under certain conditions. Entitled "Judgment Independent of the Motion," Rule 56(f) permits a district court to grant summary judgment "on grounds not raised by a party." Fed. R. Civ. P. 56(f)(2). But a district court may do so only "[a]fter giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). Because the district court did not provide Willey with notice that it would consider grounds not raised in the defendants' brief in support of their motion, we must vacate the judgment to the extent that it exceeded the grounds raised in that motion.

The motion was threadbare. The district court itself acknowledged that it was providing more to the defendants than their motion sought, writing that the defendants "failed to address this conditions-of-confinement claim in their motion for summary judgment." J.A. 671. For this reason alone, we would reinstate Willey's claim for unsanitary conditions of confinement. Some of the claims that the defendants did cursorily address in their motion were nevertheless decided by the district court on grounds not raised in the motion. To do so without notice and an opportunity to respond runs counter to Rule 56(f).

The defendants did address, for example, Willey's claim for theft of his legal documents, but their only argument was a non sequitur: Willey "alleges no facts tending to show that, in an ordinary random cell search, property is not seized and cells are not turned upside down and inside out." J.A. 628. The district court wisely declined to dismiss Willey's claim on that reasoning. Instead, the district court held that there could be no claim even for intentional deprivation of property where the state provides an adequate post-deprivation remedy, here, section 9 of the New York Court of Claims Act. Even if it were true that this generic property-deprivation law provides an adequate remedy for the theft of

24

legal documents, the district court erred in granting summary judgment on that claim, without notice to Willey or an opportunity for him to respond, on grounds that appeared nowhere in the defendants' moving papers.

Accordingly, we cannot affirm the judgment of the district court as to those parts of its decision that rested on grounds not raised by the defendants. Those parts include the claim for unsanitary conditions, the claim for theft of legal documents, and the claim for harassment. *See* J.A. 626–30. They also include Willey's claims for malicious prosecution and false imprisonment, which went unmentioned both in the motion and the decision, and which we discuss further below. This conclusion does not end our discussion, because we identify a number of critical legal errors, which the district court, we respectfully conclude, committed in analyzing the sufficiency of several of Willey's allegations.

## II. Retaliation

The first of the many allegedly false misbehavior reports that Willey received charged him with possession of a shank. In general, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest."

25

*Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). The district court correctly noted two exceptions to this rule: when an inmate is "able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right." J.A. 666–67 (citing *Freeman*, 808 F.2d at 951–53, and *Franco v. Kelly*, 854 F.2d 584, 589–90 (2d Cir. 1988)). The district court analyzed only the first of these exceptions, reasoning that "Willey has not alleged that the misbehavior reports were issued in retaliation for his exercise of a constitutionally protected right." *Id.* at 667.

In considering whether Willey received adequate due process, the district court noted that in New York an inmate has the right to " 'be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals.' " *Id.* (quoting N.Y. Comp. Codes R. & Regs., tit. 7, § 254.6(a)(2)). Accordingly, "it was violative of Willey's state regulatory rights to be excluded" from the hearings from which he was ejected or of which he was not informed. J.A. 669. But "a claim under state law does not necessarily provide a viable due process claim under 42 U.S.C. § 1983." *Id.* at 668. The district court

26

stated that Willey's "right to be personally present" at the hearing was not guaranteed by the U.S. Constitution. *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974)).

Our reading of *Wolff* does not comport with the conclusion that the Constitution permits wholesale exclusion of an inmate from a disciplinary hearing. The plaintiffs in *Wolff* brought a Fourteenth Amendment challenge to Nebraska's prisoner-discipline process. The Supreme Court sought an "accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application," rejecting Nebraska's argument that "the interest of prisoners in disciplinary procedures is not included in that 'liberty' protected by the Fourteenth Amendment." *Wolff*, 418 U.S. at 556–57. Accordingly, serious prison discipline like Willey's punishment in solitary confinement must meet "the minimum requirements of procedural due process appropriate for the circumstances." *Id.* at 558.

The Supreme Court elaborated that among those requirements are "advance written notice of the claimed violation and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary

27

action taken." *Id.* at 563. Additionally, "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Id.* at 566. Yet the Court declined to require the full panoply of procedural protections prescribed for parole revocation by *Morrissey v. Brewer*, 408 U.S. 471, 489 (1974). Specifically, *Wolff* declined to extend to internal prisoner-discipline hearings the rights of "confrontation and cross-examination[, which] present greater hazards to institutional interests."418 U.S. at 567. The Court was particularly sensitive to the possible harm that could result from permitting cross-examination of an inmate-informant, acknowledging that the risks of cross-examining guards "may be less." *Id.* at 568–69. The Court thus declined to require prisons to permit cross-examination "at the present time," leaving open the possibility that "[p]erhaps as the problems of penal institutions change and correctional goals are reshaped, the balance of interests involved will require otherwise." *Id.* at 568.

Even assuming that the last forty years have not altered this balance to require that an inmate has the right to cross-examine guards who accuse that

inmate of misconduct, we read Willey's due-process claim to concern those rights that *Wolff* did establish. Indeed, Willey's first administrative appeal prevailed because Wende failed to afford him his right to "advance written notice of the claimed violation," *id.* at 563, and his complaint alleges, "I was never informed that a hearing was taking place or ever asked if I wanted to attend," J.A. 21. Willey further alleges:

> In this situation I was never given the opportunity to appear at the tier hearing, or call witnesses, or present rebuttal evidence, nor was I ever made aware that any hearing was being commenced. In addition I was not given a written disposition by the fact finders as to the evidence relied upon for their decision.

*Id.*

These alleged procedural infirmities are, if true, repugnant not only to New York regulations but also to the Due Process Clause as construed by *Wolff*. And although not specifically mentioned in *Wolff*, the threats of physical abuse or new criminal charges allegedly made by hearing officers to Willey in an effort to induce him to plead guilty, *see id.* at 22, are incompatible with any notion of due process. Furthermore, Willey's ejection from several hearings may be actionable to the extent that it implicates his right to call witnesses and present evidence

29

rather than any right to cross-examination. The district court conflated these distinct concepts in characterizing Willey's complaint as alleging a violation of "the right to be personally present." *Id.* at 668. Nevertheless, we do not conclude on this record that Willey's procedural rights were infringed or address whether the administrative appeals process with which he eventually found some success adequately cured any infringements.

An error of omission also affected the district court's grant of summary judgment on Willey's claim for retaliation. The district court acknowledged that a false misbehavior report was actionable if done in retaliation for the exercise of a constitutional right but concluded, without elaboration, that "Willey has not alleged that the misbehavior reports were issued in retaliation for his exercise of a constitutionally protected right." *Id.* at 667. This analytical leap is somewhat surprising in light of the previous district judge's decision on the motion to dismiss, which noted "that it is unclear whether there is a constitutional right 'not to snitch.' " *Id.* at 125 n.2. The previous district judge correctly noted that we have previously left unresolved the question of whether such a right—the right to not become an informant—exists. *See Allah v. Juchnewioz*, No. 93-cv-8813, 1999 WL

562100, at *3 (S.D.N.Y. July 30, 1999) (holding that the plaintiff's "claimed conduct—his refusal to snitch when asked in the presence of other inmates—is protected"), *aff'd on other grounds sub nom. Allah v. Juchenwioz*, 176 F. App'x 187, 189 (2d Cir. 2006) (declining to reach question of whether "a prisoner enjoys a constitutional right not to become an informant").

Construing Willey's complaint in its most favorable light, it alleges that the first misbehavior report for possessing a weapon was issued to him in direct retaliation for his refusal to provide *false* information to Roberts and Lambert about an inmate whom Willey did not know. *See* J.A. 20. The only inference we need draw to reach this conclusion is that Willey was telling the truth when he said he knew nothing about the alleged smuggler of contraband and that the officers pressed him to tell them what they wanted to hear notwithstanding Willey's actual lack of knowledge.

Was this refusal constitutionally protected? In the context of deciding whether substantive due process protects a right that is deeply rooted in our traditions, the Supreme Court has counseled that we should analyze "the most specific level at which . . . the asserted right can be identified," *Michael H. v. Gerald*

31

*D.*, 491 U.S. 110, 127 n.6 (1989) (plurality opinion), and we have said that the "first step . . . is to identify the specific constitutional right allegedly infringed," *Pabon v. Wright*, 459 F.3d 241, 252–53 (2d Cir. 2006) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)). Although the intransitive verb "to snitch" does not yet merit a mention in Black's Law Dictionary, we understand it to signify the act of providing information to a person in authority about another's wrongdoing. "Snitching" carries a connotation, if not the denotation, of providing *truthful* information that inculpates the wrongdoer. Accordingly, we think that "the right not to snitch," as the previous district court judge labeled it, perhaps misconstrues—but certainly fails to identify at its most specific level—the right Willey allegedly exercised in refusing to tell officers the lies he claims they wanted to hear about his knowledge of a suspected smuggler's activities.

On appeal, Willey urges that his "right to refuse to perjure himself or give false information about another (and to testify truthfully, if he testified), is constitutionally protected." Appellants' Br. 38. But it may be that the most specific level at which to identify the putative right protecting Willey's refusal is the right of an inmate to refuse to provide false information to a corrections officer. *Cf.*

32

*Jackler v. Byrne*, 658 F.3d 225, 241 (2d Cir. 2011) (identifying as protected by the First Amendment a citizen's "right to reject governmental efforts to require him to make statements he believes are false"). In any event, the existence of that specific right is inadequately presented by the briefing, so we decline to resolve it. Whether such a right exists under the First, Fifth, Eighth, or Fourteenth Amendments, and whether it was not clearly established such that officers who may have violated it should be entitled to qualified immunity, are questions we leave to the district court to decide in the first instance.

### III. Unsanitary Conditions of Confinement

Willey alleged three periods of confinement in unsanitary conditions: in solitary confinement with a cell encapsulated by a Plexiglas cell shield; in a mental-health observation cell where he was left naked for two weeks in February 2006; and again in another observation cell from July 28 to August 24, 2006. The district court discussed only the first of these in its decision granting summary judgment. The district court found this allegation insufficient for three reasons: (1) "Willey is vague as to the dates that the alleged shut-off occurred, and has made conflicting allegations about the duration," from seven days to about seven

33

weeks, (2) "Willey has not claimed that human waste from his toilet overflowed into his cell," and (3) "Willey has not claimed that he suffered sickness or other ill effects as a result of the malodorous atmosphere caused by the water shut-off." J.A. 675–76.

We reject this constrained conception of the Eighth Amendment's protections against unsanitary conditions of confinement. A brief tour of the applicable case law, as ably canvassed by the district court, will aid our discussion. The Eighth Amendment "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), but prisons nevertheless "must provide humane conditions of confinement," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A claim under for violations of the Eighth Amendment requires (1) an "objectively, sufficiently serious . . . denial of the minimal civilized measure of life's necessities" and (2) a "sufficiently culpable state of mind" on the part of the responsible official. *Id.* at 834 (internal quotation marks and citations omitted).

Our most recent opinion in this area is *Gaston v. Coughlin*, 249 F.3d 156 (2d Cir. 2001), which reinstated an inmate's Eighth Amendment claim for exposure to human waste. In that case, the plaintiff had alleged that "on several days the area

34

directly in front of [his] cell was filled with human feces, urine, and sewage water." *Id.* at 161. The district court found that these conditions "were neither severe nor protracted enough to rise to the level of an Eighth Amendment violation," but we reversed because we were "unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end." *Id.* at 162, 166.

This sentiment was in keeping with our decision from a generation earlier, *LaReau v. MacDougall*, 473 F.2d 974 (2d Cir. 1974). There, an inmate spent five days in a cell whose toilet was a grate-covered hole in the floor, which could be flushed only from outside the cell. "Causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted. The indecent conditions that existed in this . . . cell seriously threatened the physical and mental soundness of its unfortunate occupant." *Id.* at 978. And even before *LaReau*, we found an Eighth Amendment violation in part because the cell in which the plaintiff was confined for a month was "fetid and reeking from the stench of the bodily wastes of previous occupants which . . .

35

covered the floor, the sink, and the toilet." *Wright v. McMann*, 387 F.2d 519, 522

(2d Cir. 1967).

Our sister circuits are broadly in accord. *See, e.g.*, *McBride v. Deer*, 240 F.3d

1287, 1291 (10th Cir. 2001) (vacating in part dismissal where the plaintiff alleged

that he was forced to live "in squalor—more specifically, a feces-covered cell—for

three days"); *Sperow v. Melvin*, 182 F.3d 922, 1999 WL 450786, at *2 (7th Cir. June

24, 1999) (unpublished opinion) (reversing dismissal where inmate was

"subjected to appalling conditions for three full days" including feces and urine

on the walls and mattress); *Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992) ("It

would be an abomination of the Constitution to force a prisoner to live in his own

excrement for four days in a stench that not even a fellow prisoner could stand."),

*superseded on other grounds by* Pub. L. No. 104-134, 100 Stat. 1321 (1996); *McCord v.*

*Maggio*, 927 F.2d 844, 846–47 (5th Cir. 1991) (holding that an inmate's sleeping for

two years on the floors of "roach-infested, windowless, unlighted cells[,] into

which rain water and backed-up sewage leaked" on occasion, established

unsanitary-conditions claim); *Williams v. Adams*, 935 F.2d 960, 961–62 (8th Cir.

1991) (reversing summary judgment where verified complaint alleged that during

13-day period "the toilet in the cell did not work, and that it continually ran over and leaked onto the cell floor and the floor stayed filthy with its waste" (internal quotation marks and alterations omitted)). *But see Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) (affirming summary judgment to defendants where plaintiff alleged "an overflowed toilet in his cell for four days").

From this body of case law, the district court discerned a circuit split "[w]here an inmate's exposure to waste lasts for three or four days." J.A. 674 (internal quotation marks omitted). Although locating this durational divide around three or four days' exposure to human waste, the district court

nevertheless found that Willey's complaint, which alleged, at a minimum,[2] seven

days' exposure, failed to state a claim. We disagree.

Indeed, we find erroneous each of the three apparently independent

grounds given by the district court for dismissing Willey's claim for unsanitary

conditions of confinement. The first two aim to set a minimum duration and

minimum severity of an exposure for it to reach the level of a constitutional

violation. We agree that there are many exposures of inmates to unsanitary

conditions that do not amount to a constitutional violation, but we reject the

district court's conclusion that there is any bright-line durational requirement for

---

[2] The parties dispute whether Willey should be held to a particular sentence in his original complaint summarizing his claims against Allessandro, who "purposefully shut plaintiff's toilet water and drinking water off for extensive lengths of time, and plaintiff's toilet water was turned off for a period of seven (7) days, forcing plaintiff to stay in a cell with a Plexiglas shield (no air circulation) and breathe in air smelling of urine/feces from a non-flushable toilet in direct violation of the 8th Amendment of the United States Constitution." Compl. ¶ 87, J.A. 34. This sentence was omitted from Willey's hand-written amended complaint, which was otherwise substantively identical. *See* Am. Compl. ¶ 87, J.A. 171. Even if the operative pleading were not the amended complaint or Willey were held to the omitted sentence alleging only seven days' exposure, we would still find that he stated a claim for which relief can be granted. Accordingly, we need not reach this issue. Willey's recovery on this claim at trial, if any, will be bound by the admissible evidence he adduces showing his exposure to unsanitary conditions, whether for seven days, seven weeks, or otherwise.

38

a viable unsanitary-conditions claim. Nor is there some minimal level of grotesquerie required, which goes unmet by an inmate's accumulating human waste that fills a toilet but does not "overflow[] into his cell." *Id.* at 675.

Instead, our decisions and those of other circuits evaluate the product of these two components—whether exposure to human waste is cruel and unusual depends on both the duration and the severity of the exposure. Where, for example, an exposure to human waste lasts merely ten minutes, but that exposure takes the form of working in a well while facing "a shower of human excrement without protective clothing and equipment," a jury may find an Eighth Amendment violation. *See Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990). Spending three days in that well was not required to state a claim. Likewise, a less severe exposure may be constitutionally permissible if rectified in short order but may become cruel and unusual with the prolonged passage of time. *See McCord*, 927 F.2d at 846–47 (holding that occasional sewage backup onto cell floor on which inmate slept over two-year period, among other conditions, violated Eighth Amendment).

The severity of an exposure may be less quantifiable than its duration, but its qualitative offense to a prisoner's dignity should be given due consideration. Here, the district court's analysis did not appear to consider the effect that the cell shields would have in exponentially amplifying the grotesquerie of the odor of the accumulating waste. Another relevant consideration increases the severity of Willey's second alleged exposure, which the district court did not discuss. Over those fourteen days in a filthy cell, Willey alleges that he was kept naked and without access to clothing. We do not mean to set out any precise formula—we do not say, for example, that this 14-day exposure without clothing was more or less grave than the later 28-day exposure with clothing—but any analysis must consider both the duration and the severity of an inmate's experience of being exposed to unsanitary conditions.

Finally, the district court's imposition of a third requirement—that an inmate "claim[] that he suffered sickness or other ill effects" to establish a violation, J.A. 676—fares no better. Although the seriousness of the harms suffered is relevant to calculating damages and may shed light on the severity of an exposure, serious injury is unequivocally not a necessary element of an Eighth

40

Amendment claim. *See Hudson v. McMillian*, 503 U.S. 1, 4 (1992). Even if such harm were required, Willey plainly alleged that his mental-health problems and attempted suicide followed the campaign of retaliation of which the unsanitary conditions of his confinement were a prominent part.

For these reasons, independent of the reaching of grounds not raised by the movants without notice and an opportunity to respond, we vacate the dismissal of Willey's claim for unsanitary conditions of confinement.

## IV. Additional Claims Reinstated

### A. Nutritionally Inadequate Food

The Eighth Amendment requires "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (per curiam) (internal quotation marks omitted). The district court acknowledged that Willey's complaint alleges that "the bread was usually stale and the cabbage usually rotten." J.A. 676. Accordingly, notwithstanding that "[c]ourts in this Circuit routinely have dismissed" inadequate-nutrition claims, *id.* at 677, Willey's claim is not that all

41

restricted diets are unconstitutional, but that the particular food he received was. Especially in light of the liberality courts must show to pro se pleadings, we find that Willey adequately pleaded this claim by alleging that *his* restricted diet was unusually unhealthy.

**B. Theft of Legal Documents**

As with the claim for unsanitary conditions, we have already explained that we must revive Willey's claim for theft of legal documents because the district court dismissed it on grounds not raised in the defendants' motion. We write further to clarify how to consider this claim on remand. The district court dismissed this claim "because New York state law provides him with an adequate post-deprivation remedy, i.e., § 9 of the Court of Claims Act." *Id.* at 669–70. In support of this conclusion, the district court cited the Supreme Court's holding that "even the intentional destruction of an inmate's property by a prison officer does not violate the Due Process Clause if the state provides that inmate with an adequate post-deprivation remedy." *Id.* at 669 (citing *Hudson v. Palmer*, 468 U.S. 517, 536 (1984)).

If Willey's claim were for the destruction of his television or jewelry, this analysis would suffice. But nowhere does the district court distinguish between replaceable consumer goods and possibly irreplaceable legal documents. Legal documents have characteristics that differentiate them from mere "property" whose destruction can be adequately remedied by a generic property-deprivation state law. Their theft or destruction, for example, may irrevocably hinder a prisoner's efforts to vindicate legal rights. On remand, the district court should consider this claim as one for impeding access to the courts:

> It is now established beyond doubt that prisoners have a constitutional right of access to the courts. This Court recognized that right more than 35 years ago when it struck down a regulation prohibiting state prisoners from filing petitions for habeas corpus unless they were found " 'properly drawn' " by the " 'legal investigator' " for the parole board. We held this violated the principle that "the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus."

*Bounds v. Smith*, 430 U.S. 817, 821–22 (1977) (citations omitted).

**C. Harassment**

We also vacate the dismissal of Willey's claim for harassment, again because the defendants did not mention it in their motion for summary judgment.

43

*See* J.A. 626–30. On remand, the district court has an opportunity to analyze this claim afresh under our recent decision in this area. *See Crawford v. Cuomo*, No. 14-969, 2015 WL 4728170, at *2–6 (2d Cir. Aug. 11, 2015). *Crawford* gives new guidance on the meaning of *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997), our Circuit's leading Eighth Amendment case on harassment and abuse that leaves no physical injury. The district court may also consider whether Willey's psychological pain and resulting suicide attempt constitute an "appreciable injury" that makes actionable the various forms of harassment Willey allegedly suffered. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam).

### D. Malicious Prosecution and False Imprisonment

Willey's claims for malicious prosecution and false imprisonment went unmentioned in the district court's decision, in the defendants' motion for summary judgment, and in the briefing on appeal.[3] Willey's complaint featured some of the ambiguities and inartful allegations typical of a pro se filing, which

---

[3] Waiver is an equitable doctrine, and we find more equitable the reinstatement of these claims than the act of attributing to Willey's appointed pro bono appellate counsel the knowing and voluntary relinquishment of them in light of their going unmentioned in the district court's decision.

we must liberally construe. But we have no trouble concluding that his complaint stated, at a minimum, pendent state-law claims for both malicious prosecution and false imprisonment.

Willey even emphatically underlined his malicious-prosecution claim in his amended complaint: "Plaintiff was threatened and <u>maliciously</u> <u>prosecuted</u> with false charges and outside criminal charges of allegedly possessing contraband in the form of a weapon because plaintiff refused to act as an informant for security staff." J.A. 170 (emphasis in original). The elements of a claim for malicious prosecution in New York are: " '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)). To make out a federal claim under 42 U.S.C. § 1983 in addition to a state-law claim, "a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Id.* at 160–61 (citations omitted).

45

Willey alleged these elements. First, a prosecution was initiated against Willey in Alden Town Court for his alleged possession of a shank while incarcerated at Wende, the same conduct for which he was initially sentenced to solitary confinement. Second, those charges were dismissed. Third, Willey's allegation is that Taylor and Lambert fabricated the allegation as retaliation for his refusal to provide false information to corrections officers, so he plainly pleaded lack of probable cause. Fourth, also because he alleges the prosecution was initiated in retaliation, Willey sufficiently alleges actual malice. We cannot say from the record or briefing whether the prosecution caused a violation of Willey's Fourth Amendment rights so as to permit a claim under § 1983.

Likewise, Willey's complaint alleges the elements of a claim for false imprisonment within solitary confinement. This claim, too, he did not hide: "I was in fact falsely imprisoned." J.A. 20. In New York, "[t]o establish this cause of action the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975). To succeed on the fourth

element, a plaintiff complaining of false imprisonment within solitary confinement must have "sufficiently pleaded that he had been subjected to punitive segregation for no legitimate reason and without the rudimentary protections of due process." *Gittens v. State of New York*, 504 N.Y.S.2d 969, 972 (N.Y. Ct. Cl. 1986). Willey alleged, first for his punitive segregation in solitary and then for the more-punitive segregation behind cell shields, that the confinement was intentional, that he was conscious of it, that he did not consent to it, and that it was not privileged because it was done for an illegitimate reason and without due process. As with the malicious-prosecution claim, it is unclear on this record whether Willey stated a federal claim in addition to a state-law claim for false imprisonment.

## IV. Further Proceedings

The district court (Siragusa, *J.*) denied Willey's first motion for appointment of counsel, invoking the balancing test used in our Circuit. *See* J.A. 654–55 (citing *Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997)). Later, the district court (Telesca, *J.*) denied as moot Willey's reasserted motion for appointment of counsel in the same decision granting summary judgment to the defendants. Willey's able

47

pro bono appellate counsel did not request that Willey be appointed counsel on remand or raise an argument concerning the decision denying as moot Willey's reasserted motion. But we encourage the district court, on remand, to seriously consider affording Willey appointed counsel: Not only do Willey's claims "seem[] likely to be of substance," but each of the other relevant factors may support such an appointment. *See Hodge v. Police Officers*, 802 F.2d 58, 61–62 (2d Cir. 1986) (listing other factors including "indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination").

Moreover, we suggest that the district court consider whether to permit the parties, on remand, to take further discovery about Willey's claims and that Willey receive leave to file a second amended complaint. The district court (Siragusa, *J.*) referred management of discovery to a magistrate judge, but none of the defendants was deposed and no evidence produced by discovery was submitted in connection with the motion for summary judgment.

Should Willey be appointed counsel and permitted to take discovery, the district court may well winnow several of his claims before trial. For example, we earlier identified claims for which these defendants may be entitled to qualified immunity. As another example, Willey's complaint does not name the officers responsible for the unsanitary conditions of his confinement in his second and third alleged exposures, in the mental-health observation units. Willey may yet be able to name them in a second amended complaint, but if not, those incidents do not deserve a jury's attention. We show a "special solicitude," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), toward Willey as a pro se litigant by keeping alive, for now, these claims for unsanitary conditions of confinement, which we would dismiss in a counseled complaint for failing to identify the responsible officers who acted with the requisite culpability. But of course we leave management of discovery and trial to the sound discretion of the district court.

For all these reasons, we VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.