Darnell v. City of New York

# UNITED STATES COURT OF APPEALS
## For the Second Circuit

_____

August Term, 2016

Argued: September 22, 2016          Decided: February 21, 2017

Docket No. 15-2870

_____

KEVIN DARNELL, GERMAIN CANO, MICHAEL GLENN, MICHAEL MCGHEE, KERRY SCOTT, TRAVIS GORDAN, GREGORY MAUGERI, DMITRIY MILOSLAVSKIY, STEVEN MODES, JACQUELINE GUARINO, MICHAEL SPALANGO, WESLEY JONES, RAYMOND TUCKER, YVONNE MING, NANCY VIGLIONE, KEITH JENNINGS, ELLI VIKKI, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED, ERIC CEPHUS, PHILLIP SINGLETON, DEBORAH GONZALEZ,

*Plaintiffs – Appellants*,

Nakaita Moore, Jahmel Lawyer, Peter Eppel,

Plaintiffs,

—v.—

RAFAEL PINEIRO, WILLIAM TOBIN, CITY OF NEW YORK, KENNETH KOBETITSCH,

*Defendants – Appellees*,

Deputy Commissioners John Does, 1-5, (representing the Deputy Commissioners who supervised the operation of Brooklyn Central Booking from June 12, 2010 to the present), Police Officers John Does, 1-5, (representing the commanding officers of Brooklyn Central Booking from June 12, 2010 to the present), Police Commissioner Raymond Kelly,

*Defendants.*[†]

_____

---

[†] The Clerk of Court is respectfully requested to amend the caption to conform to the above.

Before: LEVAL AND LOHIER, Circuit Judges, and KOELTL, District
Judge.[*]

Twenty state pretrial detainees brought individual § 1983 claims in the same complaint alleging that the City of New York and the supervisory officers of a pre-arraignment holding facility (collectively, "the defendants") were deliberately indifferent to allegedly unconstitutional conditions of confinement at the holding facility. The United States District Court for the Eastern District of New York (Kuntz, J.) granted summary judgment in favor of the defendants, denied the detainees' motion to reconsider that judgment, and denied a subsequent motion to reconsider the denial of the motion for reconsideration. The detainees appealed.

The detainees concede that certain claims were properly dismissed. As to those claims, we affirm the District Court's judgment. However, because there were genuine disputes as to material facts with respect to the challenged conditions of confinement, the individual defendants' knowledge of those conditions, and the failure to remedy those conditions, as well as to the liability of the City of New York, we vacate the judgment as to the remaining claims that were dismissed and remand for further proceedings.

---

[*] Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

SCOTT A. KORENBAUM (Stephen Bergstein, on the brief), Bergstein & Ullrich, LLP, Chester, NY, for Plaintiffs-Appellants.

ZACHARY W. CARTER, (Richard Dearing, Devin Slack, Kathy Chang Park, on the brief), Corporation Counsel of the City of New York, New York, NY, for Defendants-Appellees.

John G. Koeltl, District Judge:

This is a case about unconstitutional conditions of confinement for pretrial detainees. Twenty state pretrial detainees ("the plaintiffs")[1] arrested on separate dates between July 10, 2011, and July 23, 2013, brought individual § 1983 claims in the same complaint against the City of New York (the "City"), New York City Police Department ("NYPD") Captain Kenneth Kobetitsch, and NYPD Captain William Tobin (the "individual defendants") (collectively, "the defendants").[2] The

---

[1] The plaintiffs are Kevin Darnell, Germain Cano, Michael Glenn, Michael McGhee, Kerry Scott, Travis Gordan, Gregory Maugeri, Dmitriy Miloslavskiy, Steven Modes, Jacqueline Guarino, Michael Spalango, Wesley Jones, Raymond Tucker, Yvonne Ming, Nancy Viglione, Keith Jennings, Elli Vikki, Eric Cephus, Phillip Singleton, and Deborah Gonzalez. Three additional plaintiffs initially brought claims against the defendants, but, prior to this appeal, two voluntarily dismissed their claims without prejudice, and one passed away.
[2] The John Doe defendants named in the original complaint are no longer parties to this action because the plaintiffs did not pursue claims against them in the amended complaints. During the proceedings before the District Court, the plaintiffs voluntarily dismissed with prejudice the claims against former NYPD Commissioner Raymond Kelly. By letter dated September 22, 2016, the plaintiffs abandoned the appeal of the judgment dismissing their claims against Raphael Pineiro, the former

plaintiffs alleged that they were each subjected to appalling conditions of confinement while held pre-arraignment at Brooklyn Central Booking ("BCB") with deliberate indifference to the deprivation of their Fourteenth Amendment due process rights. Because BCB was only a pre-arraignment holding facility, no plaintiff was held at BCB for more than twenty-four hours.

The United States District Court for the Eastern District of New York (Kuntz, J.) granted summary judgment to the defendants, reasoning that the plaintiffs failed to meet both the objective and subjective requirements for a claim of unconstitutional conditions of confinement based on a theory of deliberate indifference. The District Court concluded that, with respect to the "objective prong," no plaintiff could establish an objectively substantial deprivation of any constitutional rights because no plaintiff actually suffered a serious injury, or was "regularly denied his or her basic human needs or was exposed to conditions that posed an unreasonable risk of serious damage to his or her future health" for more than twenty-four hours; nor could any plaintiff establish the "subjective prong" of a deliberate indifference claim by proving that the individual defendants were actually aware of any dangerous conditions, or that the individual defendants acted unreasonably

---

First Deputy Commissioner of the NYPD. The judgment dismissing the claims against Mr. Pineiro is accordingly affirmed.

4

in responding to any such conditions; nor, for similar reasons, could the plaintiffs establish that the individual defendants acted with punitive intent. See Cano v. City of New York, 119 F. Supp. 3d 65, 74, 82, 85-86 (E.D.N.Y. 2015). Because no plaintiff could prove a constitutional deprivation, the District Court also held that the individual defendants were entitled to qualified immunity, and that the plaintiffs could not establish that the City was liable pursuant to Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690–91 (1978). See Cano, 119 F. Supp. 3d at 86-87.

The District Court issued its opinion shortly after the Supreme Court's decision in Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015), in which the Supreme Court held that, for excessive force claims brought under the Due Process Clause of the Fourteenth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Id. at 2473. The Court rejected the requirement that, for such claims, a pretrial detainee establish a state of mind component to the effect that the official applied the force against the pretrial detainee "maliciously and sadistically to cause harm." Id. at 2475 (citation omitted). The District Court's opinion was also issued two weeks before this Court's decision in Willey v. Kirkpatrick, 801 F.3d 51, 66-68 (2d Cir. 2015), in which this Court held that while the proper

5

inquiry for a conditions of confinement claim is by reference to the duration and severity of the conditions, the claim did not require a "minimum duration" or "minimum severity" to reach the level of a constitutional violation. This Court further made clear that a "serious injury is unequivocally not a necessary element of an Eighth Amendment [conditions of confinement] claim." Id. at 68.

The District Court did not analyze the implications of Kingsley in its opinion. Moreover, the District Court denied the plaintiffs' motion for reconsideration based on Willey, as well as the plaintiffs' later motion for reconsideration of the order denying the first motion for reconsideration, because the District Court found that the plaintiffs' appeal of the summary judgment order divested it of jurisdiction over the case.

Among other issues, this case requires us to consider whether, consistent with Willey, and the precedents on which it is based, appalling conditions of confinement cannot rise to an objective violation of the Fourteenth Amendment's Due Process Clause so long as the detainee is subjected to those conditions for no more than twenty-four hours, and the detainee does not suffer an actual, serious injury during that time. This case also requires us to consider whether Kingsley altered the

standard for conditions of confinement claims under the Fourteenth Amendment's Due Process Clause.[3]

For the reasons explained below, we affirm in part, and vacate in part, the District Court's judgment, and remand the case to the District Court for further proceedings.

## I.

In reviewing the District Court's grant of summary judgment in favor of the defendants, "we construe the evidence in the light most favorable to the Plaintiffs, drawing all reasonable inferences and resolving all ambiguities in their favor." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 118 (2d Cir. 2013) (citation and internal quotation marks omitted). We affirm the grant of summary judgment only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Our review is *de novo*. Ruggiero v. County of Orange, 467 F.3d 170, 173 (2d Cir. 2006).

---

[3] This case implicates the Due Process Clause of the Fourteenth Amendment because it involves state pretrial detainees who are seeking to vindicate their constitutional rights. See, e.g., Benjamin v. Fraser, 343 F.3d 35, 49 (2d Cir. 2003), overruled on other grounds by Caiozzo v. Koreman, 581 F.3d 63, 70 (2d Cir. 2009). However, the analysis in this decision should be equally applicable to claims brought by federal pretrial detainees pursuant to the Due Process Clause of the Fifth Amendment. See Malinski v. New York, 324 U.S. 401, 415 (1945) (Frankfurter, J., concurring) ("To suppose that 'due process of law' meant one thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection.").

**A.**

This is a lawsuit on behalf of twenty individual plaintiffs rather than a class action. As such, this is a review of a judgment dismissing the separate claims of twenty plaintiffs that were filed in a single complaint.

In its analysis, the District Court did not perform individualized assessments of each plaintiff's claims, reasoning instead that, because no plaintiff's confinement at BCB exceeded twenty-four hours, and no plaintiff suffered an actual, serious physical injury, no plaintiff could establish a violation. As discussed below, the District Courted erred in its analysis. Although the evidence differed with respect to the conditions that each plaintiff was subjected to, we summarize the facts in the light most favorable to the plaintiffs as a group to explain the error in the District Court's grant of summary judgment dismissing the Second Amended Complaint. On remand, however, it will be necessary for the District Court to analyze each plaintiff's claims, both with respect to the conditions of confinement experienced by each plaintiff, and the personal involvement of the individual defendants with respect to the claims of each plaintiff.

**B.**

**(i)**

During the relevant period, BCB was a temporary holding facility located at 275 Atlantic Avenue, Brooklyn, New York, that held recently arrested pretrial detainees awaiting arraignment. BCB has since been relocated to a different facility in Brooklyn. The facility at issue in this dispute is no longer used to hold pretrial detainees.[4]

Individual defendant Captain Kenneth Kobetitsch was the commanding officer at BCB through July 2011, and his tenure only overlapped with the detention of plaintiff Glenn.[5] Thereafter, beginning on August 29, 2011, individual defendant Captain William Tobin became BCB's commanding officer, a position he still holds, and his tenure overlapped with the detention of the other plaintiffs. During their respective tenures, Captain Kobetitsch and Captain Tobin supervised the officers and the staff at BCB. Captain Kobetitsch and Captain Tobin toured and

---

[4] The plaintiffs initially brought claims against the defendants seeking compensatory damages and injunctive relief, but, in proceedings before the District Court, the plaintiffs abandoned the request for injunctive relief.

[5] By letter dated September 22, 2016, the plaintiffs abandoned their claims against Captain Kobetitsch, except as to plaintiff Glenn, because Captain Kobetitsch was the commanding officer of BCB only at the time plaintiff Glenn was detained there. The judgment dismissing the claims against Captain Kobetitsch---with the exception of plaintiff Glenn's claims against Captain Kobetitsch---is accordingly affirmed.

inspected BCB daily, including its holding cells. Captain Tobin testified that he monitored BCB for "cleanliness."

BCB had eight holding cells, six designated for use by men and two by women. Subordinate officers guarded detainees and also purportedly received "training and instructions with respect to, among other things, transferring detainees between cells, ensuring that there [was] an appropriate number of detainees in individual cells, so as to avoid overcrowding, handling and providing food and beverages to detainees, proper sanitation procedures, and the proper method for handling and disposing of human excrement."

**(ii)**

On separate dates between July 10, 2011, and July 23, 2013, each plaintiff was arrested and detained in holding cells at BCB.[6] Because BCB is a temporary holding facility, each plaintiff was held in custody at BCB from between ten to twenty-four hours. While detained at BCB during the two-year period, each plaintiff was allegedly subjected to one or more degrading conditions of confinement that purportedly constitute nine types of constitutional deprivations: (1) Overcrowding; (2) Unusable Toilets; (3) Garbage and Inadequate Sanitation; (4) Infestation;

---

[6] With the exception of plaintiffs Spalango and Tucker, who were each detained at BCB on March 13, 2013, and plaintiffs Jennings and Singleton, who were each detained at BCB on July 23, 2013, the plaintiffs' confinements at BCB did not overlap with each other.

(5) Lack of Toiletries and Other Hygienic Items; (6) Inadequate Nutrition; (7) Extreme Temperatures and Poor Ventilation; (8) Deprivation of Sleep; and (9) Crime and Intimidation. The evidence adduced related to each condition, construed in the light most favorable to the plaintiffs, is discussed in turn.

**1. Overcrowding.** The plaintiffs consistently testified that, for the majority of their respective confinements at BCB, they and other detainees were packed into overcrowded cells designed for, at best, one-half to one-third the actual capacity. For example, one plaintiff testified that his holding cell was so crowded that he could not determine if it had a toilet. Another plaintiff described his cell as "having no room to even stand" because it was "stuffed . . . like a can of sardines."

The plaintiffs testified that, because the cells were so full, there was often only space to stand for hours at a time, and that being forced to stand for hours continuously was painful and degrading. Even when there was space in the cells, the plaintiffs were reluctant to sit or lie down because the floors were filthy. As one plaintiff testified, he only sat down "out of extreme necessity" because he was "exhausted" and "dehydrated." While cells contained hard benches, there were not nearly enough benches in any given cell to accommodate its numerous occupants.

11

**2. Unusable Toilets.** Each cell at BCB contained, at best, one exposed toilet that lacked a seat, lid, toilet paper, or sufficient privacy partitions to conceal a toilet user from his or her fellow holding mates. One plaintiff, who was too tired to remain standing, testified that he curled up in a fetal position next to the toilet, the only place he could find room to do so in the cell. Some plaintiffs testified that they were kept for stretches in cells that did not have any toilet at all.

Captain Tobin testified that, as a general practice, toilets were cleaned and maintained regularly. Captain Tobin also swore that "[d]etainees are never placed in a cell with a non-functioning toilet" and that "[t]here is always at least one roll of toilet paper provided in each cell."

But the plaintiffs consistently testified that, for any cell that did have a toilet, the toilet rim and bowl, along with the surrounding floor and walls, were covered with some combination of feces, maggots, urine, vomit, and rotten milk. The toilets were frequently clogged and would overflow, spilling their contents. The smell was horrific, with one plaintiff describing the odor in the cells as "overbearing." The plaintiffs testified that roaches, mice, and other insects and vermin were commonplace in the area around the toilets.

Under these circumstances, the plaintiffs testified that, to varying degrees and for varying reasons, they found the

12

toilets unusable. Some testified that they had the tolerance to urinate in the toilets, while others could not bring themselves to use the toilets even for urination. Some plaintiffs testified that they did not use the toilet for the eminently practical reason that it was clogged or overflowing, leading those plaintiffs to fear that any overflow would spill into the cell and even land on other detainees standing, sitting, or lying next to the toilet; while others found the toilet and surrounding area simply too sickening and unsanitary to use. As one plaintiff testified, "you would have to be really out of your mind to use" the toilet.

One plaintiff testified that he defecated in his pants because he could no longer control his bowels. Another plaintiff testified that he used a toilet to defecate without any toilet paper. That plaintiff was later given an almost depleted roll of toilet paper, which did not have enough paper for him to clean himself.

Some of the plaintiffs testified that they asked officers to take them to other cells with less filthy toilets, requests the officers almost invariably denied.

**3.     Garbage and Inadequate Sanitation.** Given that many of the toilets were clogged and overflowing, the plaintiffs unsurprisingly testified that the holding cells themselves were filthy. The cells had feces and dried urine caked to the floors.

13

The stench from the toilets drifted through the holding cells, and caused one plaintiff to "dry heav[e] . . . yellow bile." The plaintiffs consistently testified that the floors were sticky and covered with garbage and other unsanitary items, such as vomit, dead roaches, decaying apple cores, old milk cartons, and rotting sandwiches. One plaintiff testified that he could not "recall a time [the cells were] sanitary for a human being."

Pursuant to prison policy, the cells did not contain trash cans and detainees were expected to throw their trash on the floor. Captain Tobin swore that BCB's cells were cleaned by BCB custodial staff three times a day. However, the plaintiffs did not testify to witnessing any BCB staff cleaning or maintaining the cells.

**4.    Infestation.** The plaintiffs consistently testified that the holding cells were infested with rats, mice, cockroaches, flies, and other insects and vermin. One plaintiff testified that he saw mice and roaches coming out of a radiator; another testified that he saw water bugs emerging from the toilet and nearby exposed pipes; while another described seeing roaches in the area where the food was stored, and under a sink. Yet another plaintiff testified that he observed roaches climbing on his sneaker. Finally, some plaintiffs testified that they watched as rats and insects crawled into, out-of, and around the boxes where food was stored.

**5. Lack of Toiletries and Other Hygienic Items.** The plaintiffs generally testified that they were not provided with basic toiletries, such as soap, tissues, toothbrushes, toothpaste, and toilet paper, and that the officers generally refused to provide these items even when explicitly requested. One plaintiff, who was menstruating at the time of her detention, began "bleeding all over [her]self." She testified that the officers were dismissive of her repeated requests for sanitary napkins, and that she stopped asking for sanitary napkins only when she heard an officer reprimand another detainee for making similar requests. Likewise, another plaintiff testified that he and his fellow detainees took turns asking the officers for toilet paper. The officers responded by threatening to delay arraignment if the detainees kept "harassing [them]."

**6. Inadequate Nutrition.** The plaintiffs generally found the food and water provisions nutritionally inadequate. The plaintiffs testified that the sandwiches, and much of the other food, were moldy, rotten, stale, or otherwise inedible. Some plaintiffs described seeing vermin and insects crawling in and around the food boxes, which caused those plaintiffs to avoid the food. One plaintiff testified that he saw another detainee receive a sandwich that had rat bite marks in it. Another plaintiff, a practicing Jewish Rabbi, refused to eat any food

15

because it was not Kosher. When the plaintiff complained to an officer, the officer replied, "[b]eggars can't be choosy." Under these circumstances, some of the plaintiffs refused to eat any food at BCB.

Many plaintiffs also testified that they did not trust that the "drinking water" at BCB was potable because it was only accessible from a grimy cooler on the floor, a filthy fountain, or a dirty sink adjacent to the toilet. Some plaintiffs testified that the water from those sources looked rusty and otherwise foul.

Other plaintiffs testified that they did not have access to any water or food, in any condition, for long periods of time. One plaintiff testified that he asked for water, but that BCB ran out of water. Another plaintiff testified that he did not ask the officers for water or food after he witnessed the officers ridiculing another detainee who had made the same request.

Under these circumstances, many of the plaintiffs refused to drink water and became dehydrated. Some plaintiffs were given milk, but most refused to drink it because it was inexplicably hot. The plaintiffs testified that the officers ignored the plaintiffs' concerns with respect to the milk and water.

**7. Extreme Temperatures and Poor Ventilation.** The holding cells were located in areas of BCB that suffered from poor

ventilation, which exacerbated odor problems. In addition, the plaintiffs testified that they were subjected to extreme temperatures depending on the season and the location at BCB---as such, a plaintiff might experience extreme heat and extreme cold on the same day while moving through BCB. Some plaintiffs testified that they found BCB unbearably hot while others testified that they found it unbearably cold. One plaintiff arrested in January 2012 testified that she removed her socks and shoes due to the "ridiculous[] heat" even though she found the cells, including the cell floors, disgusting and repulsive.

**8. Deprivation of Sleep.** The plaintiffs testified that they generally could not sleep while at BCB for a variety of reasons. The filthy state of the holding cells, coupled with the sheer number of detainees housed in any given cell, made it difficult to find enough room to lie down---many plaintiffs refused to sit or lie down on the floors at all. While BCB apparently had mats that it would provide detainees upon request, many plaintiffs testified that they were unaware of their availability and, regardless, did not see any provided in the cells. To explain why she did not think to request a mat, one plaintiff mused that, "if [the officers] would not give somebody toilet paper, I didn't think they" would give us mats. The plaintiffs who were given mats testified that the mats were

filthy and, in any event, that there was no room in the cells to lie down on them because of the overcrowding.

**9.  Crime and Intimidation.** The plaintiffs witnessed other detainees fight each other. Some plaintiffs testified that officers did not monitor the cells to break up altercations. One plaintiff testified that she was kicked, pushed, and verbally abused by other detainees, and that there was no officer nearby to intervene. Another plaintiff testified that he was verbally accosted by two other detainees for about ten hours, but that the officers ignored his requests to be transferred to another cell.

**(iii)**

The plaintiffs paint a picture of BCB that is alarming and appalling. The plaintiffs testified that they found the conditions at BCB degrading, humiliating, and emotionally scarring. One plaintiff testified: "I was not treated in a humane manner. I believe if I were a dog, and that if the A.S.P.C.A. was brought in and there was a dog in that cell, that the police officers, whoever were responsible for the treatment of that dog in that cell, that they would be brought up on charges." Another plaintiff had an anxiety attack that required hospitalization, which he explained:

> [S]tarted because of the deplorable conditions. I tried holding my bowel for about four hours. I wasn't able to use the bathroom or any form of the bathroom

18

and I found it very hard to breathe. My chest was very heavy and I tried to alert the guard. One guard just walked by and when they were letting in more people I told the guard I have to go to the hospital. I'm having chest pains and it was maybe 30 minutes after that they took me to the medical cell.

Another plaintiff testified that the experience "stay[ed]" with him, explaining that it was something that was difficult to forget.

However, the plaintiffs did not generally testify that they suffered serious long term physical injuries or illnesses.

**c.**

**(i)**

The plaintiffs filed their initial complaint on June 26, 2013, which they amended on August 7, 2013, and again on September 12, 2013. The defendants moved to dismiss the plaintiffs' claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion the District Court denied in an Opinion and Order dated September 12, 2014. See Cano v. City of New York, 44 F. Supp. 3d 324 (E.D.N.Y. 2014).

Although not the subject of the current appeal, this prior opinion by the District Court provides helpful background. In that opinion, the District Court noted that the defendants had argued for a nearly "*per se* rule that no matter the conditions, if a detainee is only exposed to them for less than twenty-four hours, there can be no objective constitutional violation." Id.

at 333. The District Court rejected the defendants' argument, reasoning that even temporary deprivations could be objectively unconstitutional so long as those conditions were sufficiently serious. See id. The District Court accordingly held that the plaintiffs had "plausibly alleged that the conditions of confinement at BCB deprived them of the minimal civilized measures of life's necessities and subjected them to unreasonable health and safety risks." Id. (citing Walker v. Schult, 717 F.3d 119, 126 (2d Cir. 2013)).

In addition, relying on this Court's decision in Caiozzo v. Koreman, 581 F.3d 63, 70 (2d Cir. 2009), the District Court concluded that, to state a claim for unconstitutional conditions of confinement, the plaintiffs were required to allege that the individual defendants had acted with deliberate indifference in a subjective sense, namely that the defendants knew and disregarded excessive risks to the plaintiffs' health and safety. Cano, 44 F. Supp. 3d at 332-34. The District Court held that the plaintiffs had met this threshold, ruling that it was plausible that the individual defendants were aware of the challenged conditions based on, among other things, "their own observations . . . external reports and complaints; complaints filed by detainees; reports by the media; and prior lawsuits." Id. at 334.

The District Court also held that the plaintiffs had adequately alleged punitive intent and personal involvement by the individual defendants. See id. at 334-36.

**(ii)**

At the close of extensive discovery---which included, among other things, the often uncontroverted deposition testimony of each plaintiff---the defendants moved for summary judgment, which the District Court granted in an Opinion and Order dated August 13, 2015. Cano v. City of New York, 119 F. Supp. 3d 65 (E.D.N.Y. 2015).

The District Court began by stating that it would describe the facts of the case "in the light most favorable to the Plaintiffs, the non-moving party." Id. at 70 (citation omitted). However, the District Court never described the evidence of the conditions that each individual plaintiff faced. Instead, the District Court summarized the case by quoting allegations from the Second Amended Complaint before proceeding to its discussion of the case. See id. at 70-71. The District Court ultimately held that the defendants were entitled to summary judgment for several reasons. Id. at 72-73.

First, the District Court found that no jury could conclude that any of the evidence of the challenged conditions of confinement, "either taken in the aggregate or taken as a whole," objectively deprived any of the plaintiffs of their due

21

process rights. Id. at 81. In contrast to the state of law described in its opinion denying the defendants' motion to dismiss, the District Court concluded that, "[t]he Second Circuit and her constituent District Courts have routinely held that occasional and temporary deprivations of sanitary and temperate conditions, *without more*, do not constitute a sufficiently serious deprivation under the Eighth Amendment to constitute punishment." Id. at 74. Accordingly, the District Court held that, "while certain conditions may have been uncomfortable for Plaintiffs, the evidence fails to establish any Plaintiff was *regularly* denied his or her basic human needs or was exposed to conditions that posed an unreasonable risk of serious damage to his or her future health." Id. (emphasis added). In particular, the District Court reasoned that no plaintiff could establish an objective constitutional deprivation because no plaintiff could link any condition of confinement to any actual serious injury, and because the period of confinement did not exceed twenty-four hours for any plaintiff. See, e.g., id. ("Plaintiffs fail to show any of them were subjected to overcrowding for an extended period of time and further fail to establish any of them were injured in any way from the overcrowding."); id. at 82 ("Most Plaintiffs did not seek any sort of medical treatment and none of the Plaintiffs provide evidence of having suffered any long term

22

physical or emotional harm due to time spent in the BCB."); see also id. at 74-82.

Second, the District Court concluded that no reasonable jury could find that the plaintiffs had satisfied the subjective prong of a deliberate indifference claim, namely that the officers knew about conditions that posed excessive risks to the plaintiffs' safety and health. The Court found that the evidence for the individual defendants---especially BCB's log book entries, which documented sporadic cleaning and maintenance efforts, and Captain Tobin's deposition testimony---established that the individual defendants had reasonable practices in place to ensure that the officers under their supervision acted reasonably in response to any risks. Id. at 84-85. The District Court found that the individual defendants had acted with, at most, mere negligence. Id. at 84. Moreover, the District Court found that none of the individual defendants could have known about the allegedly unconstitutional conditions because there was no evidence that the subordinate officers who actually guarded the detainees informed the individual defendants of any of the challenged conditions, which were not unconstitutional in any event. See id. at 85.

Third, for substantially the same reasons, the District Court concluded that there was no triable issue of fact as to

23

whether any individual defendant had acted with punitive intent. See id. at 85-86.

Finally, because the plaintiffs had failed to establish a triable issue of fact that any of them had suffered an objective deprivation (and therefore failed to establish an underlying constitutional violation), the District Court concluded that the individual defendants were entitled to qualified immunity, and that the plaintiffs could not prove that the City had any Monell liability. See id. at 86-87.

**(iii)**

On August 14, 2015, the District Court entered judgment dismissing the plaintiffs' Second Amended Complaint. On August 28, 2015, this Court issued its decision in Willey. On the same day, the plaintiffs informed the District Court of their intention to move for reconsideration based on Willey, and the District Court later set a briefing schedule whereby the motion for reconsideration would be fully briefed by October 23, 2015.

On September 11, 2015, the plaintiffs timely filed a Notice of Appeal challenging the District Court's grant of summary judgment. Later that day, the plaintiffs filed with the District Court their motion for reconsideration pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure, and Local Rule 6.3(e) of the United States District Court for the Eastern District of New York. On the same day, in a minute order (the

24

"First Minute Order"), the District Court denied the motion for reconsideration, stating that the appeal divested it of jurisdiction over the case.

The plaintiffs promptly moved for reconsideration of the First Minute Order, arguing that, pursuant to Rule 4(a)(4)(B)(i) of the Federal Rules of Appellate Procedure, the appeal did not divest the District Court of jurisdiction to reconsider the judgment. On September 12, 2015, in another minute order (the "Second Minute Order"), the District Court denied without elaboration the plaintiffs' motion for reconsideration of the First Minute Order. On October 5, 2015, the plaintiffs filed an Amended Notice of Appeal challenging, in addition to the grant of summary judgment, the First and Second Minute Orders.[7]

## II.

A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the

---

[7] It is unnecessary to reach the plaintiffs' appeal challenging the First and Second Minutes Orders, which were entered post-judgment. Those Orders do not raise any substantial issues that affect the disposition of this appeal. To the extent that the plaintiffs' Notice of Appeal divested the District Court of its jurisdiction to hear the post-judgment motions, Rule 62.1 of the Federal Rules of Civil Procedure permits district courts to issue "indicative rulings" to appellate courts when "a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending." Fed. R. Civ. P. 62.1; see also Fed. R. App. P. 12.1. In the indicative ruling, the district court may indicate if it believes that the relief sought is meritorious, meritless, or merits further consideration, and request that the appellate court remand the case for further proceedings.

Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. Benjamin v. Fraser, 343 F.3d 35, 49 (2d Cir. 2003), overruled on other grounds by Caiozzo v. Koreman, 581 F.3d 63, 70 (2d Cir. 2009); see also City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). A pretrial detainee's claims are evaluated under the Due Process Clause because, "[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.'" Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007) (quoting Benjamin, 343 F.3d at 49–50), rev'd on other grounds sub nom., Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere, 463 U.S. at 244.

A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions. See Benjamin, 343 F.3d at 50. This means that a pretrial detainee must satisfy two prongs to prove a claim, an "objective prong" showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a "subjective prong"---perhaps better classified as a "*mens rea* prong" or "mental element prong"---showing that the officer acted with at

26

least deliberate indifference to the challenged conditions. The reason that the term "subjective prong" might be a misleading description is that, as discussed below, the Supreme Court has instructed that "deliberate indifference" roughly means "recklessness," but "recklessness" can be defined subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known). See Farmer v. Brennan, 511 U.S. 825, 836-37 (1994).

Relying on this Court's decision in Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009), the District Court concluded that the elements for establishing deliberate indifference under the Fourteenth Amendment were the same as under the Eighth Amendment. Cano, 119 F. Supp. 3d at 72 (citing Caiozzo, 581 F.3d at 72). Therefore, the District Court required the plaintiffs to prove that, "(1) objectively, the deprivation the [detainee] suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind . . . , such as deliberate indifference to [detainee] health or safety.'" Id. at 73 (quoting Walker, 717 F.3d at 125).

In applying this test, the District Court erred in two respects. First, the District Court misapplied this Court's precedents in assessing whether the plaintiffs had established

27

an objectively serious deprivation. Second, we conclude that the Supreme Court's decision in Kingsley altered the standard for deliberate indifference claims under the Due Process Clause.

**A.**

Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health," Walker, 717 F.3d at 125, which includes the risk of serious damage to "physical and mental soundness," LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir. 1972). There is no "static test" to determine whether a deprivation is sufficiently serious; instead, "the conditions themselves must be evaluated in light of contemporary standards of decency." Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995) (citing Rhodes v. Chapman, 452 U.S. 337, 346 (1981)). For example, "[w]e have held that prisoners may not be deprived of their basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health." Jabbar v. Fischer*,* 683 F.3d 54, 57 (2d Cir. 2012) (citation and internal quotation marks omitted).

"[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they

28

have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" Walker, 717 F.3d at 125 (quoting Wilson v. Seiter, 501 U.S. 294, 304 (1991)). Unsanitary conditions, especially when coupled with other mutually enforcing conditions, such as poor ventilation and lack of hygienic items (in particular, toilet paper), can rise to the level of an objective deprivation. See id. at 127–28 (collecting cases).

In Willey v. Kirkpatrick, 801 F.3d 51, 68 (2d Cir. 2015), this Court recently reiterated that the proper lens through which to analyze allegedly unconstitutional unsanitary conditions of confinement is with reference to their severity and duration, not the detainee's resulting injury. In Willey, a convicted prisoner brought, among other claims, a claim under the Eighth Amendment against officers at a prison who allegedly exposed him to unsanitary conditions by confining him alone in a cell with little airflow, and then incapacitating his toilet for a period of, at a minimum, seven days "so that he was reduced to breathing a miasma of his own waste." Id. at 55. In addition, on two separate occasions (during one of which the prisoner was kept naked), the officers confined the prisoner to an observation cell smeared with feces and urine. See id. at 55, 58.

In reinstating the prisoner's claim, Willey reviewed Second Circuit case law involving exposure to unsanitary conditions, and, consistent with this Court's precedents, made clear that unsanitary conditions of confinement must be assessed according to two components, severity and duration, on a case-by-case basis.[8] Id. at 66-68 (citing Gaston v. Coughlin, 249 F.3d 156 (2d Cir. 2001); LaReau v. MacDougall, 473 F.2d 974 (2d Cir. 1972)). While Willey acknowledged that "there are many exposures of inmates to unsanitary conditions that do not amount to a constitutional violation," the Court rejected a "bright-line durational requirement for a viable unsanitary-conditions claim" or a "minimal level of grotesquerie required" before such a claim could be brought. Id. at 68. As this Court explained, "[t]he severity of an exposure may be less quantifiable than its duration, but its qualitative offense to a prisoner's dignity should be given due consideration." Id. Finally, the Court noted that "serious injury is unequivocally not a necessary element of an Eighth Amendment claim," although "the seriousness of the harms suffered is relevant to calculating damages and may shed light on the severity of an exposure." Id.

Willey also reinstated the prisoner's claim based on the provision of nutritionally inadequate food, concluding that the

---

[8] The Court also noted that other Courts of Appeals are broadly in accord with this analytical framework. See Willey, 801 F.3d at 67 (collecting cases).

30

prisoner's allegations that he was usually served stale bread and rotten cabbage for one week were sufficient to allege an objective deprivation. Id. at 69. This Court again rejected the imposition of bright-line limits on inadequate nutrition claims, noting that the prisoner's "claim is not that all restricted diets are unconstitutional, but that . . . . *his* restricted diet was unusually unhealthy." Id.

Some of the challenged conditions in this case, such as inadequate nutrition, and unsanitary conditions---including inoperable toilets and filthy cells---are clearly covered by Willey. Other conditions at issue, such as overcrowding, do not necessarily fall under Willey's express ambit. However, Willey was not breaking new ground, but rather reaffirming the law in this Circuit, and its reasoning applies to the other challenged conditions in this case.

While the claims before the Court in Willey related to unsanitary conditions and inadequate nutrition, this Court has been reluctant to impose bright-line durational or severity limits in conditions of confinement cases, and has never imposed a requirement that pretrial detainees show that they actually suffered from serious injuries. See Walker, 717 F.3d at 129 (distinguishing Rhodes v. Chapman, 452 U.S. 337 (1981), by reasoning that the Supreme Court did not hold, as a matter of law, that the provision of a cell sufficient to afford a

31

pretrial detainee thirty-one square feet of space could not be an unconstitutional deprivation of living space). Even in the rare case where the Court has imposed bright-line limits, those limits have been flexible and dependent upon the circumstances. See Jabbar, 683 F.3d at 57 ("We hold that the failure of prison officials to provide inmates with seatbelts on prison transport buses does not, *standing alone*, violate the Eighth or Fourteenth Amendments." (emphasis added)).

Bright-line limits are generally incompatible with Fourteenth Amendment teaching that there is no "static" definition of a deprivation, see Blissett, 66 F.3d at 537 (citing Rhodes, 452 U.S. at 346), and the Supreme Court's instruction that any condition of confinement can mutually enforce another, so long as those conditions lead to the same deprivation, see Wilson, 501 U.S. at 304; see also Walker, 717 F.3d at 127-28. The latter point is implicit in Willey, 805 F.3d at 68, which found that conditions that would normally have nothing to do with sanitation (for example, poor air circulation or being kept naked) can exacerbate the harmful effects of unsanitary conditions. Accordingly, this Court has repeatedly reiterated that conditions of confinement cases involve fact-intensive inquiries. See, e.g., Willey, 805 F.3d at 68-69.

The standards for evaluating objective deprivations, as articulated in Willey, thus extend to each of the nine

32

challenged conditions of confinement at issue in this case---(1) Overcrowding; (2) Unusable Toilets; (3) Garbage and Inadequate Sanitation; (4) Infestation; (5) Lack of Toiletries and Other Hygienic Items; (6) Inadequate Nutrition; (7) Extreme Temperatures and Poor Ventilation; (8) Deprivation of Sleep; and (9) Crime and Intimidation---regardless of whether those conditions relate to a deprivation involving sanitation or inadequate nutrition. Each of these conditions must be measured by its severity and duration, not the resulting injury, and none of these conditions is subject to a bright-line durational or severity threshold. Moreover, the conditions must be analyzed in combination, not in isolation, at least where one alleged deprivation has a bearing on another. See Wilson, 501 U.S. at 304 (noting the synergy between cold temperatures and the failure to provide blankets in establishing an Eighth Amendment violation). An overcrowded cell, for example, may exacerbate the effect of unsanitary conditions. Similarly, poor ventilation may be particularly harmful when combined with an overflowing toilet. Inadequate nutrition may be compounded by infestation.

**B.**

The second element of a conditions of confinement claim brought under the Due Process Clause of the Fourteenth Amendment is the defendant's "deliberate indifference" to any objectively serious condition of confinement. Courts have traditionally

33

referred to this second element as the "subjective prong." But "deliberate indifference," which is roughly synonymous with "recklessness," can be defined either "subjectively" in a criminal sense, or "objectively" in a civil sense. As such, the "subjective prong" might better be described as the "*mens rea* prong" or "mental element prong."

Just over two decades ago, in Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court addressed the meaning of "deliberate indifference" in the context of a convicted prisoner's deliberate indifference to conditions of confinement claim brought under the Cruel and Unusual Punishments Clause of the Eighth Amendment. The Supreme Court concluded that deliberate indifference is properly equated with the *mens rea* of "recklessness." Id. at 836. However, the Court observed that recklessness is not completely self-defining. See id. The Court noted that recklessness could be defined according to an objective standard akin to that used in the civil context, which would not require proof of an official's actual awareness of the harms associated with the challenged conditions, or according to a more exacting subjective standard akin to that used in the criminal context, which would require proof of such subjective awareness. See id. at 836-37.

The Supreme Court in Farmer rejected the application of an objective standard for deliberate indifference as inappropriate

34

under the Cruel and Unusual Punishments Clause, holding that an official "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. The Supreme Court based its holding on a close reading of the text of the Cruel and Unusual Punishments Clause, which "outlaws cruel and unusual 'punishments,'" not "cruel and unusual 'conditions.'" Id. According to the Supreme Court, "punishment" connotes a subjective intent on the part of the official, which also requires awareness of the punishing act or omission. See id. at 836-37. As the Court stated, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Id. at 838.

Farmer did not address deliberate indifference for pretrial detainees under the Due Process Clause of the Fourteenth Amendment. Following Farmer, this Court seven years ago in Caiozzo, 581 F.3d at 66, discerned two lines of Fourteenth Amendment deliberate indifference authority in this Circuit: one that applied an objective standard and another that applied a

35

subjective standard. Caiozzo resolved the intra-circuit divergence, holding that the same subjective standard for deliberate indifference claims under the Eighth Amendment's Cruel and Unusual Punishments Clause should apply to deliberate indifference claims under the Fourteenth Amendment's Due Process Clause, which the Court reasoned was "a logical extension of the principles recognized in Farmer."[9] Id. at 71. This Court explained that this Court's jurisprudence for claims brought under the Eighth Amendment had generally mirrored this Court's jurisprudence for claims under the Fourteenth Amendment. See id. (citing Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000)). Relying on the analysis of the Court of Appeals for the Fifth Circuit in Hare v. City of Corinth, Mississippi, 74 F.3d 633 (5th Cir. 1996) (en banc), this Court highlighted that the Supreme Court had given no indication that pretrial detainees should be treated differently from their post-conviction counterparts. See Caiozzo, 581 F.3d at 71-72 (quoting Hare, 74 F.3d at 649). This Court also noted that the majority of the

---

[9] Caiozzo, 581 F.3d at 68, involved a claim for deliberate indifference to medical needs under the Fourteenth Amendment. Nevertheless, the Court's interpretation of "deliberate indifference" applied to any pretrial detainee claim for deliberate indifference to "serious threat to . . . health or safety"---such as from unconstitutional conditions of confinement, or the failure-to-protect---because deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment. See id. at 72.

36

other Courts of Appeals had reached a similar conclusion. See id. at 71 n.4 (collecting cases).

The Supreme Court's decision in Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015)---in which the Supreme Court concluded that excessive force claims brought under the Fourteenth Amendment do not require the same subjective intent standard as excessive force claims brought under the Eighth Amendment---has undercut the reasoning in Caiozzo.[10] The issue before the Supreme Court in Kingsley was whether "to prove an excessive force claim [under the Fourteenth Amendment], a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." Kingsley, 135 S. Ct. at 2470 (emphasis added). Kingsley involved a pretrial detainee's allegations that prison officers, who had undisputedly deliberately used force against the detainee (by using a Taser to incapacitate him), had, in doing so, acted with excessive force. See id.

Regarding the requisite *mens rea* for the officer's use of force against the detainee, the Court held "that a pretrial

---

[10] See also Ross v. Correction Officers John & Jane Does 1-5, 610 F. App'x 75, 77 n.1 (2d Cir. 2015) (summary order). The panel in Ross did not reach the implications of Kingsley because it concluded that the defendant-official there was entitled to qualified immunity, which resulted in the dismissal of the plaintiff's claims. See id.

detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."[11] Id. at 2472-73. The Court observed that, "[t]hus, the defendant's state of mind is not a matter that a plaintiff is required to prove." Id. at 2472.

The Court reasoned that its interpretation of excessive force claims under the Due Process Clause was consistent with its prior precedents, including Bell v. Wolfish, 441 U.S. 520 (1979), where the Court had held that a pretrial detainee can prevail on a claim brought under the Fourteenth Amendment challenging "a variety of prison conditions, including a prison's practice of double-bunking" solely by proffering objective evidence to show that the conditions were not reasonably related to a legitimate, nonpunitive governmental purpose. Kingsley, 135 S. Ct. at 2473 (citing Bell, 441 U.S. at 541-43). The Court found that the focus of Bell and its progeny

---

[11] The Supreme Court in Kingsley framed its analysis by observing that excessive force cases involve "two separate state-of-mind questions. The first concerns the defendant's state of mind with respect to his physical acts—i.e., his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns the defendant's state of mind with respect to whether his use of force was 'excessive.'" Kingsley, 135 S. Ct. at 2472. The Court did not address the first question because it was undisputed that the officers had deliberately used force against the detainee by purposefully and knowingly using the Taser on the detainee, although the Court left open the possibility that the mental state of recklessness might suffice for the first state-of-mind question as well. Id.

on punishment "does not mean that proof of intent (or motive) to punish is required for a pretrial detainee to prevail on a claim that his due process rights were violated" or that the "application of Bell's objective standard should involve subjective considerations."[12] Id. at 2473-74 (collecting cases).

The Court also concluded that Eighth Amendment excessive force jurisprudence did not control the standard for excessive force claims under the Fourteenth Amendment. See id. at 2475 (finding that Eighth Amendment cases "are relevant here only insofar as they address the practical importance of taking into account the legitimate safety-related concerns of those who run jails"). The Court stressed the different functions of the Eighth Amendment's Cruel and Unusual Punishments Clause and the Fourteenth Amendment's Due Process Clause:

> The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less "maliciously and sadistically." Thus, there is no need here, as there might be in an Eighth Amendment case, to determine when punishment is unconstitutional. Id. (citations omitted).

---

[12] A pretrial detainee can establish a due process claim for inhumane conditions of confinement either by proving an official's deliberate indifference to those conditions, or by proving that that those conditions are punitive. See Benjamin, 343 F.3d at 50. Kingsley and its precedents are clear that the two theories of liability are distinct. Nothing about our interpretation of the proper standard for deliberate indifference for due process purposes should be construed as affecting the standards for establishing liability based on a claim that challenged conditions are punitive.

Following the Supreme Court's analysis in Kingsley, there is no basis for the reasoning in Caiozzo that the subjective intent requirement for deliberate indifference claims under the Eighth Amendment, as articulated in Farmer, must apply to deliberate indifference claims under the Fourteenth Amendment. Caiozzo is thus overruled to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment.[13]

Farmer is clear that "deliberate indifference" can be viewed either subjectively or objectively. In the context of a convicted prisoner asserting a violation of an Eighth Amendment right to be free from cruel and unusual punishments, the Supreme Court in Farmer defined deliberate indifference subjectively, meaning that a prison official must appreciate the risk to which a prisoner was subjected. The conditions of confinement were a form of punishment, and, based on the Supreme Court's interpretation of the Cruel and Unusual Punishments Clause, the prison official had to have subjective awareness of the harmfulness associated with those conditions to be liable for meting out that punishment.

After Kingsley, it is plain that punishment has no place in defining the *mens rea* element of a pretrial detainee's claim

---

[13] This opinion has been circulated to all of the judges of the Court prior to filing.

40

under the Due Process Clause. Unlike a violation of the Cruel and Unusual Punishments Clause, an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.

Kingsley held that an officer's appreciation of the officer's application of excessive force against a pretrial detainee in violation of the detainee's due process rights should be viewed objectively. The same objective analysis should apply to an officer's appreciation of the risks associated with an unlawful condition of confinement in a claim for deliberate indifference under the Fourteenth Amendment. A pretrial detainee may not be punished at all under the Fourteenth Amendment, whether through the use of excessive force, by deliberate indifference to conditions of confinement, or otherwise.

Therefore, to establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have

41

known, that the condition posed an excessive risk to health or safety. In other words, the "subjective prong" (or "*mens rea* prong") of a deliberate indifference claim is defined objectively.

In concluding that deliberate indifference should be defined objectively for a claim of a due process violation, we join the Court of Appeals for the Ninth Circuit, which, sitting *en banc* in Castro v. County of Los Angeles, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc), cert. denied, No. 16-655, 2017 WL 276190 (U.S. Jan. 23, 2017), likewise interpreted Kingsley as standing for the proposition that deliberate indifference for due process purposes should be measured by an objective standard.[14] The Court of Appeals for the Ninth Circuit concluded that Kingsley's broad reasoning extends beyond the excessive force context in which it arose.[15] See id. at 1069 ("The

---

[14] Castro dealt with deliberate indifference in a failure-to-protect case, but---like this Court's interpretation of deliberate indifference, see note 9, supra---the interpretation of deliberate indifference by the Court of Appeals for the Ninth Circuit is equally applicable to a conditions of confinement claim. See Castro, 833 F.3d at 1069-70 (overruling Clouthier v. County of Contra Costa, 591 F.3d 1232 (9th Cir. 2010), which had held that a subjective test applied to due process claims for deliberate indifference to addressing serious medical needs); Williams v. Fresno Cty. Dist. Attorney's Office, No. 16-cv-00734 (DAD)(MJS), 2016 WL 5158943, at *4 (E.D. Cal. Sept. 20, 2016) (applying Castro test to a due process claim for deliberate indifference to conditions of confinement).

[15] The defendants cite several decisions by other Courts of Appeals that have continued to apply a subjective standard to deliberate indifference claims for pretrial detainees after

42

underlying federal right, as well as the nature of the harm suffered, is the same for pretrial detainees' excessive force and failure-to-protect claims.").

The defendants argue that using an objective standard to measure deliberate indifference---a similar standard to the one used before Caiozzo, see, e.g., Benjamin, 343 F.3d at 51; Liscio v. Warren, 901 F.2d 274, 276 (2d Cir. 1990), overruled by Caiozzo, 581 F.3d at 71---risks that officials that act with mere negligence will be held liable for constitutional violations. But any § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence.[16] See Kingsley, 135 S. Ct. at 2472 ("[L]iability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." (citation omitted)). A detainee must prove that an official acted intentionally or recklessly,

---

Kingsley. But none of those cases considered whether Kingsley had altered the standard for deliberate indifference for pretrial detainees. See, e.g., Brown v. Chapman, No. 15-3506, 2016 WL 683260 (6th Cir. Feb. 19, 2016); Moore v. Diggins, 633 F. App'x 672 (10th Cir. 2015) (summary opinion); Mason v. Lafayette City-Par. Consol. Gov't, 806 F.3d 268 (5th Cir. 2015); Smith v. Dart, 803 F.3d 304, 310 n.2 (7th Cir. 2015) (noting, in light of Kingsley, that the parties argued the state of mind element but that "it is not at issue in this appeal").

[16] The reckless or intentional action (or inaction) required to sustain a § 1983 deliberate indifference claim must be the product of a voluntary act (or omission) by the official. See Farmer, 511 U.S. at 835 (observing that the word "deliberate" in "deliberate indifference" might "require[] nothing more than an act (or omission) of indifference to a serious risk that is voluntary, not accidental" (citation omitted)).

43

and not merely negligently. Indeed, pre-Caiozzo case law that applied an objective standard was clear that officials could not be found liable for negligent conduct. See, e.g., Liscio, 901 F.2d at 275.

The defendants also argue that the return to an objective definition of deliberate indifference will open the flood-gates to litigation. The argument is unpersuasive. Prior to Caiozzo, some courts in this Circuit applied an objective standard for deliberate indifference. Caiozzo chose to apply a subjective standard to deliberate indifference because this Court thought that it was more consistent with Farmer, not because of any concerns that an objective standard would prompt the filing of non-meritorious claims. Consistency with the Supreme Court's decision in Kingsley now dictates that deliberate indifference be measured objectively in due process cases.

## III.

## A.

The District Court erroneously granted summary judgment for the defendants on the basis that no jury could find that the nine challenged conditions of confinement in this case, considered together or separately, amounted to an objective constitutional deprivation because no plaintiff could establish a regular deprivation lasting more than twenty-four hours, or an actual serious injury or sickness. However, the plaintiffs have

44

adduced substantial evidence, much of it uncontroverted, that they were subjected to appalling conditions of confinement to varying degrees and for various time periods. While we recognize that the District Court did not have the benefit of this Court's guidance in Willey, the plaintiffs' claims should not have been dismissed on the grounds that the conditions in this case did not exceed ten to twenty-four hours, or result in serious injury.

The District Court repeatedly stressed that the plaintiffs were not *regularly* denied humane conditions of confinement: "Plaintiffs only complain of such issues for a short period of time—an average of ten to twenty-four hours—with nothing more." Cano, 119 F. Supp. 3d at 73; see also, e.g., id. at 75 ("[T]he uncontroverted evidence establishes that no Plaintiff was *regularly* deprived access to a toilet."); id. at 77 ("Here, not a single Plaintiff was exposed to urine, feces, and/or vomit for anything more than a limited period of time because no Plaintiff was held at BCB for more than one twenty-four hour period."); id. at 79 ("[T]here is no evidence that a single Plaintiff was *regularly* denied any such toiletry during his or her stay at BCB . . . ."). The District Court essentially ruled that no set of conditions, no matter how egregious, could state a due process violation if the conditions existed for no more than ten to twenty-four hours. This was error. Willey, 801 F.3d at 68.

45

The District Court also repeatedly stressed the lack of any actual serious injury or illness in the case. See, e.g., Cano, 119 F. Supp. 3d at 82 ("Most Plaintiffs did not seek any sort of medical treatment and none of the Plaintiffs provide evidence of having suffered any long term physical or emotional harm due to time spent in the BCB."). In Willey, 801 F.3d at 68, this Court rejected the argument that a plaintiff must prove a serious injury in order to establish a constitutional violation due to inhumane conditions of confinement.

The defendants argue that the District Court's judgment should be affirmed based on an assessment of the severity and duration of the conditions at issue. They argue that Willey supports their position given its admittedly more extreme facts. They contend that those are the types of facts that constitute an objective deprivation. They further contend that no plaintiff in this case actually suffered a long term, grievous physical or emotional injury, a not-so-subtle attempt to bring the standard full circle back to evaluating objective deprivation by injury.

Ultimately, the defendants' theory appears to be that state officials are free to set a system in place whereby they can subject pretrial detainees awaiting arraignment to absolutely atrocious conditions for twenty-four hour periods (and perhaps more) without violating the Constitution so long as nothing actually catastrophic happens during those periods. That is not

46

the law. As the District Court aptly stated in denying the defendants' motion to dismiss, "[o]ur Constitution and societal standards require more, even for incarcerated individuals, and especially for pretrial detainees who cannot be punished by the state." Cano, 44 F. Supp. 3d at 333. This Court's cases are clear that conditions of confinement cases must be evaluated on a case-by-case basis according to severity and duration, and instructs that a pretrial detainee's rights are at least as great as those of a convicted prisoner. Based on the record, the gradation between the conditions of confinement at issue in this case, and those at issue in Willey, may speak to damages, not the absence of an objective constitutional deprivation.

**B.**

In addition, the District Court granted summary judgment to the individual defendants because it concluded that the plaintiffs could not establish that the individual defendants had acted with subjective deliberate indifference, as opposed to objective deliberate indifference. The District Court neither analyzed Kingsley, nor had the benefit of our interpretation of Kingsley as set forth in this opinion, which inures to the benefit of the plaintiffs. The defendants argue that the judgment should nevertheless be affirmed based on the standard for deliberate indifference articulated here. The defendants' argument should be addressed in the first instance by the

47

District Court. The purported deliberate indifference of the individual defendants must be assessed on an individualized basis with respect to each plaintiff.[17]

## C.

The District Court also erred in its application of the well-settled standards for deciding a motion for summary judgment. The District Court did not construe the evidence in the light most favorable to the plaintiffs, nor did it draw all reasonable inferences in their favor.

For example, the District Court justified the rejection of the plaintiffs' inadequate nutrition claims in part by noting that plaintiff Vikki had "claimed that BCB served 'wonderful cheese and bologna sandwiches.'" Cano, 119 F. Supp. 3d at 80. Although not reflected in the District Court's opinion,

---

[17] The defendants also argue on appeal that the plaintiffs have failed to establish that the individual defendants had any personal involvement in any of the challenged conditions of confinement. As counsel for the defendants conceded at oral argument, although the defendants raised the personal involvement argument on their motion to dismiss, they did not renew the argument in their motion for summary judgment. In their summary judgment papers, the defendants only raised the personal involvement argument with respect to the former First Deputy Commissioner of the NYPD, Raphael Pineiro, who is no longer a party to this action. See note 2, supra. The defendants' argument is accordingly not preserved for review and deemed waived. See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 124 n.29 (2d Cir. 2005). In any event, the plaintiffs' claims against the individual defendants rely on the evidence that the individual defendants personally toured BCB on a daily basis, and were thus aware of the conditions at the holding facility.

plaintiff Vikki later clarified in her deposition that she did not eat the sandwiches "[b]ecause the cheese was dry, the bread was dry, and [she] wouldn't feed it to [her] dog." Construed in the light most favorable to the plaintiffs, plaintiff Vikki's comment about "wonderful" sandwiches was sarcastic.

In another example, the District Court noted that plaintiff Guarino had asked for a sanitary napkin to clean herself because she was menstruating and "bleeding all over [her]self," but the District Court indicated that there was no proof that "any officer at BCB acted with a sufficiently culpable state of mind." Id. at 84. This ignored plaintiff Guarino's testimony that, after repeatedly asking for a sanitary napkin, she only desisted because she observed an officer threaten another detainee with delayed arraignment if that detainee made any additional requests.

Moreover, the District Court discounted as a mere matter of preference the plaintiffs' testimony that toilets were unusable, reasoning that the plaintiffs were not "denied access" to toilets. Id. at 75-76. That frames the plaintiffs' testimony far too narrowly. The plaintiffs' testimony was that the toilets (if there were any toilet in the particular cell) could not be used for bowel movements because the toilets lacked privacy, and because the toilets were not kept in such a way that they could reasonably be used. The plaintiffs' theory is that the toilets

49

were maintained by deliberately indifferent officers in such a manner that they were unusable. It is not a reasonable inference that the plaintiffs merely decided not to use the toilets, especially when one plaintiff defecated in his pants, another defecated without toilet paper, and a third had an anxiety attack that required hospitalization because he was "holding [his] bowel for about four hours."

Contrary to the District Court's ruling that the individual defendants "establish[ed] [that] they responded reasonably to any risk that existed," see id. at 83-85, the evidence about regularly scheduled cleanings and pest control visits, at best, established that there are genuine disputes as to material facts concerning the handling of sanitation issues at BCB. The fact of thrice daily visits by cleaning crews, even if undisputed, would not eliminate the force of the plaintiffs' testimony that the cleaning crews did not do what was needed to clean the cells, or remedy the non-functioning toilets.

### D.

The District Court also granted summary judgment for the defendants on the grounds that the plaintiffs could not establish a claim based on punitive intent; that the individual defendants were entitled to qualified immunity; and that the plaintiffs could not establish that the City had Monell liability. In light of the foregoing rulings, we vacate these

rulings as well, although we do not decide how those issues should be decided using the proper standards, including the standards for a due process claim for deliberate indifference to the conditions of confinement described above.

With respect to the plaintiffs' punitive intent theory, the District Court should reconsider the dismissal of that theory in light of the evidence of the objectively serious conditions of confinement.

With respect to qualified immunity and Monell liability, the District Court based its rulings solely on its finding that no plaintiff could establish an objective due process deprivation. Because we disagree with that conclusion, we vacate the qualified immunity and Monell liability rulings, and remand those issues for further consideration in light of this opinion.[18] See, e.g., Jova v. Smith, 582 F.3d 410, 418 n.4 (2d Cir. 2009) (per curiam) (remanding the issue of qualified immunity where the district court did not consider the question in the first instance).

---

[18] The parties dispute whether letters from the Correctional Association of New York---which the defendants contend support the conclusion that the individual defendants are entitled to qualified immunity---are inadmissible hearsay. The District Court never ruled on this issue and, because we do not reach the qualified immunity issue, we do not reach the admissibility issue.

**CONCLUSION**

For the reasons explained above, the judgment is **AFFIRMED** in part, and **VACATED** in part, and the case is **REMANDED** for further proceedings consistent with this opinion.