Matter of People ex rel. Stoughton v Brann (2020 NY Slip Op 04236)





Matter of People ex rel. Stoughton v Brann


2020 NY Slip Op 04236


Decided on July 23, 2020


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 23, 2020

Friedman, J.P., Renwick, Gische, Mazzarelli, Moulton, JJ.


451609/20 11815 260234/20 11814

[*1] The People of the State of New York, ex rel. Corey Stoughton, on behalf of Venus Williams, et al., Petitioners-Appellants,
v
Cynthia Brann, etc., et al., Respondents-Respondents. 
Physicians for Human Rights and Affiliated Medical Professionals, Amici Curiae.
The People of the State of New York, ex rel. Brent Low and Jeremiah Rygus, on behalf of Hassan Muhammad, et al., Petitioners-Appellants,
v
Cynthia Brann, etc., et al., Respondents-Respondents.


Janet E. Sabel, The Legal Aid Society, New York (Corey Stoughton of counsel), for Gregory Jason, Anibal Quinones, Anthony Brown, Gian Verdelli, Eleuterio Carmona, Joseph Torres, Freddie Johnson, Ricardo Gonzales, Willie Florence and Hollis Hosear, appellants.
Brent Low and Jeremiah Rygus, Neighborhood Defender Service of Harlem, New York (Jeremiah Rygus of counsel), for Hassan Muhammad, Juan Reyes, Bala Niambele, Gregory Murad and Dennis Brown, appellants.
James E. Johnson, Corporation Counsel, New York (Jonathan Popolow of counsel), for Cynthia Brann, respondent.
Letitia James, Attorney General, New York (Philip J. Levitz of counsel), for Anthony Annucci, respondent.
Cyrus R. Vance, Jr., District Attorney, New York (Patricia J. Bailey of counsel), for Cyrus R. Vance, Jr., respondent.
Bridget G. Brennan, Special Narcotics Prosecutor, New York (Jannine Rowser of counsel), for Bridget G. Brennan, respondent.
Cleary Gottlieb Steen & Hamilton LLP, New York (Thomas J. Moloney of counsel), for amici curiae.



Judgment (denominated an order), Supreme Court, New York County (Steven M. Statsinger, J.), entered on or about March 20, 2020, and judgment (denominated a decision), [*2]Supreme Court, Bronx County (Albert Lorenzo, J.), entered on or about April 13, 2020, denying the petitions for writs of habeas corpus, unanimously affirmed, without costs.
These two "mass" habeas corpus proceedings are brought by defendants incarcerated on Rikers Island. Some are awaiting trial, and others have been convicted and are alleged to have violated their conditions of parole. Petitioners claim federal and state constitutional violations stemming from their continued detention despite the ongoing COVID-19 pandemic. The Stoughton proceeding was commenced on or about March 20, 2020 by 116 inmates at Rikers Island. All but nine of those petitioners have since been released. Each of the nine remaining petitioners allege that they have underlying conditions, including cardiovascular disease, hepatitis C, diabetes, asthma, and pulmonary disease. The Low proceeding was brought on or about April 8 by five Rikers inmates, only two of whom remain incarcerated. One petitioner is HIV-positive, and the other is a diagnosed tuberculosis carrier who also claims to be asthmatic.
The Stoughton petitioners were denied habeas relief, initially on the basis that they did not establish that respondents' failure to release them in the face of the health threat amounted to the constitutional violation of "deliberate indifference." Deliberate indifference is the standard applied under the 14th Amendment where an inmate alleges that conditions of confinement "pose an unreasonable risk of serious damage" (Darnell v Pineiro , 849 F3d 17, 30 [2d Cir 2017]) and that officials "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [officials] knew, or should have known, that the condition posed an excessive risk to health or safety" (id. at 35). On a motion for renewal brought by the Stoughton petitioners, the court elaborated that, unlike the usual case where a defendant is released from court and is given a date certain to return there, here petitioners were being asked to be released from jail , with there being no mechanism to advise them as to when they were expected to return. Thus, in addition to adhering to its determination on the federal constitutional question, the court rejected the state constitutional due process violation alleged by petitioners. The State Constitution is violated in condition-of-confinement cases where there is deliberate indifference, but the analysis also requires a balancing of the harm to the individual resulting from the alleged condition against the benefit sought by the State through continuation of the condition (Cooper v Morin , 49 NY2d 69, 79 [1979]). Here, the Stoughton court found that the second prong weighed heavily in favor of respondents, since the need to ensure petitioners' return to jail was "a compelling governmental interest that would be affected to an extreme degree by the relief requested." The court additionally held that the individual petitioners provided insufficient factual information necessary to assess their flight risks, as well as the particular medical vulnerabilities that heightened their risks for serious illness or death if they contracted COVID-19.
The Low petitioners were also denied habeas relief. That court did not engage in the constitutional analysis performed by the Stoughton court; rather, it recited the flight risk factors posed by each petitioner were they to be released and the health conditions alleged by each petitioner, and concluded in each case that there was a compelling reason articulated by the State to continue the detention. With respect to petitioner Juan Reyes, the court noted that he was on parole for sexual crimes when he was rearrested for video recording up a woman's skirt. As for petitioner Dennis Brown, the court observed that he was on parole when he failed to report to a required program, changed his address, and was rearrested for assault.
On appeal, petitioners collectively argue that the courts erred in holding that respondents did not act with deliberate indifference to the presence of COVID-19 in the jail and the effect it can have on vulnerable inmates. Petitioners identify the risk as the undeniable presence of the novel coronavirus within the jail, coupled with their particular vulnerabilities to the potentially deadly effects of the virus. With respect to the conditions, petitioners acknowledge the substantial measures prison officials have taken to mitigate the spread of the virus among the jail population. However, they assert that any measures short of immediate release from custody would be insufficient to protect them from the risk of contracting COVID-19 in light of their medical risk factors. They point to the constant turnover of inmates in the jails, where there is a regular stream of new arrivals. Further, they state that while jail authorities have instituted testing, it is not done regularly on new detainees, and then only on symptomatic and vulnerable [*3]people, missing those who may be carrying the virus but are asymptomatic. More concerning to petitioners is the fact that prison staff, who leave the facility after each shift to interact with, and possibly be exposed to the virus by, their families, friends, and countless other people whom they encounter, are not being regularly tested when arriving for their next shift. In fact, petitioners assert that as of mid-May, the vast majority of people at the jail who have contracted the virus were people who work there. Petitioners also cite calls from correctional public health experts, including from the New York City Board of Correction and Correctional Health Services (CHS), to immediately release those most vulnerable to the virus.
Petitioners further cite to the impossibility of "perfect" infection containment. Indeed, the Low petitioners append an "observational audit" performed by the DOC in April, and they characterize the published findings as demonstrating that the efforts to mitigate spread of the virus by taking steps such as mandating mask wearing, keeping prisoners physically distanced from each other and aggressively disinfecting surfaces, are, however sincere, "merely aspirational." For example, the study found that only 50% of cell areas housing people who were symptomatic or exposed to the virus had a limited number of detainees and proper social distancing practices. Further, only 54% of staff were observed wearing masks consistently and correctly. Petitioners contend that DOC has made no effort to explain how, considering these data points, the mitigation steps DOC has taken will protect each petitioner from contracting the virus. Petitioners also contend that the courts should have found that respondents violated the due process clause of the state constitution. They assert that their interest in avoiding the worst effects of the novel coronavirus obliterates the corresponding interest of the government in ensuring their presence at their next court appearances.
As for respondents' positions, the City Department of Correction certainly does not claim to guarantee a COVID-free environment in the city jails. However, it contends that it has done everything reasonably possible to minimize the spread of the disease, and that it has been successful in "flattening the curve" and seeing very few detainees die. Indeed, the City asserts that releasing detainees where it has direct authority to do so, and otherwise working with the State to suggest release of other detainees, are important weapons in its arsenal against COVID, and claims that, as a result, its jail population is the lowest it has been since the 1940s. This, the City contends, has resulted in the "overwhelming majority" of dormitory units being less than half-full, greatly increasing the ability to promote social distancing. The City also touts its early success in providing masks to all detainees and staff members, with replacements readily available, and its aggressive testing regime, with testing at a rate that is over four times the rate conducted of the general New York City population.
The City additionally stresses that it has taken substantial steps to segregate from the rest of the jail population those detainees who are medically vulnerable and those who have tested positive for COVID-19. For example, a building that had recently been closed was converted into a "surge" medical unit. Further, prison officials established therapeutic housing whereby detainees who are asymptomatic but considered high risk are separated from other inmates and are closely monitored by medical personnel, while those who are symptomatic with test results pending are housed in single cells. Notably, as of the submission of this appeal, three Rikers detainees had died from COVID-19, which, while tragic, is proportionately lower than the death rate for the general New York City public. The City notes that, on May 19, 2020, one month after the "observational audit" on which petitioners rely, the senior vice president of CHS appeared before the New York City Council Committees on the Justice System and Criminal Justice, and testified that:
"As a result of the Department's longstanding emergency preparedness protocols, our considerable experience in contagious disease management, adherence to CDC and DOHMH guidelines, and innovative problem-solving, we are seeing success. The number of new positive cases and quarantined housing units across the facilities is steadily declining, a clear indication that our containment strategies are working."
For its part, New York State Department of Corrections and Community Supervision (DOCCS) acknowledges that the most preferable course of action to combat the spread of COVID-19 is release, and argues that it has taken a comprehensive review of detainees being held on parole violations and new criminal charges to see who can be safely let out. However, it states that part of this review involves the assessments it makes whenever it is faced with recommending that an arrestee be permitted to remain at liberty while charges are pending. For parole violators this encompasses considering their risk scores, whether they were convicted of sex offenses, whether they suffer from mental illness or have a history of domestic violence, and whether they had existing residences or placements in housing facilities. Indeed, DOCCS maintains that approximately one half of all people being held on technical parole violations or absconding charges have been released in accordance with this policy. It further asserts that it is implementing new criteria for issuing parole warrants designed to narrow the pool of new detainees.
DOCCS argues that there has been no constitutional violation because the data show that the City's efforts, over which DOCCS has no control, have actually resulted in a steady decline in the number of COVID-19 cases in City jails. Thus, petitioners cannot establish that the State has been deliberately indifferent to petitioners' health concerns. In any event, DOCCS argues that petitioners have the burden of establishing deliberate indifference, and have not met it, since they failed to explain how their particular, individualized circumstances, including the conditions of their confinement, placed them at increased risk of becoming seriously ill. At the same time, DOCCS stresses that it has explained the particularized threat to society flowing from any decision to release petitioners, and that its conclusions concerning those detainees outweigh any threat to petitioners' health given the mitigation measures being taken in the jail.
We agree with the result in each of these proceedings. Far from acting recklessly, respondents have demonstrated great care to ensure the safety of everyone who enters the facility. By any objective measure, they have been anything but indifferent to the risk that COVID-19 poses to the jail population.
Even petitioners admit that respondents have taken substantial measures to reduce the spread of the virus on Rikers Island, and have had success in doing so. Moreover, petitioners have not cited to any controlling authority to establish that anything short of release constitutes deliberate indifference. They do cite a plethora of federal district court cases granting habeas corpus petitions related to COVID-19, but those decisions involved immigration detainees where the United States Immigration and Customs Enforcement agency (ICE) did virtually nothing to mitigate the threat. The contrast between those cases and this one is clear, especially where ICE detainees are being held on civil immigration violations, not in connection with crimes. For these reasons, petitioners have failed to establish any due process violation under the United States Constitution.
We further hold that petitioners have not made out a claim under the State Constitution. The State articulated compelling reasons why petitioners needed to continue to be held, such as their commission of serious offenses and violations of parole. That the State has agreed to release a significant number of detainees to help control the spread of the virus actually demonstrates that it has given a great deal of consideration to who should and should not be released, and its decision not to release petitioners based on their criminal history backgrounds is thus persuasive. Coupled with what the State and City have done to protect detainees, discussed above, we conclude that the weighing of interests falls in respondents' favor.
We also believe that, notwithstanding that we perceive no constitutional violation in these cases, deciding them in a holistic fashion is less than ideal. It would be the better practice for habeas courts reviewing future cases while the pandemic persists to perform individualized assessments of those who petition the court for release. These assessments should consider, at the very least, each petitioner's risk of flight as assessed by the state, the particular health factors asserted by the petitioner as documented by appropriate medical records and physician affirmations where practical, the specific conditions of the petitioner's confinement at the time the petition is filed, and the environment into which the petitioner will be released and whether there is a plan in place to protect that person from contracting the virus and to monitor their [*4]health. With that data, courts hearing similar petitions will be in a good position to balance the competing interests at issue, and make decisions that recognize the potentially serious implications of confinement on detainees with underlying health conditions, but at the same time ensure the State's ability to enforce the law against those who might not return to face justice once released. We note that much of the information outlined above, which would be critical to make the necessary individualized assessments, was not supplied by petitioners in
these proceedings. Accordingly, even had the habeas courts attempted to decide the petitions on a case-by-case basis, they would have been faced with inadequate records.
M-1707 - The People of the State of New York, ex rel. Corey Stoughton, on behalf of Venus Williams, et al. v Cynthia Brann, Commissioner, New York City Department of Correction, et al. 
Motion by Physicians for Human Rights, among others, to file amici brief granted.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JULY 23, 2020
CLERK